PATRICK, Appellee and Cross–Appellant,

v.

PAINESVILLE COMMERCIAL PROPERTIES, INC., Appellant and Cross–Appellee.

[Cite as *Patrick v. Painesville Commercial Properties, Inc.* (1997), 123 Ohio App.3d 575.]

Court of Appeals of Ohio, Eleventh District, Lake County.

No. 95–L–158.

Decided Oct. 1, 1997.

*Patrick J. Perotti,* for appellee and cross–appellant.

*Timothy P. Cannon* and *Stanley R. Gorom III,* for appellant and cross–appellee.

---

FORD, Presiding Judge.

Appellant, Painesville Commercial Properties, Inc.,[1] appeals from a judgment of the Lake County Court of Common Pleas in favor of appellee, Robert Patrick.[2]

This is the second time the parties to the instant appeal have appeared before this court. This cause originated on October 7, 1992, when appellee filed a complaint against appellant, "alleging nine counts arising from his discharge from [appellant's] employ." *Patrick v. Painesville Commercial Properties, Inc.* (1994), 99 Ohio App.3d 360, 362, 650 N.E.2d 927, 929 (*"Patrick I"*). Appellant moved for summary judgment, which was granted by the trial court on December 8, 1993.

Appellee appealed to this court. *Patrick I.* We vacated the judgment and remanded the cause to the trial court on the counts relating to promissory estoppel and implied contract. *Id.* at 367, 650 N.E.2d at 932. In *Patrick I,* we stated that implied contract and promissory estoppel are the exceptions to the doctrine of employment at will, articulated the requirements for promissory estoppel, noted the additional compelling factors that must be proved on such a claim, and held that there were genuine issues for trial as to the doctrine of promissory estoppel and whether an implied contract existed between the parties. *Id.* at 363–366, 650 N.E.2d at 929–932.

Upon remand, a jury trial was conducted. Appellee testified that he answered appellant's classified advertisement for a heating, ventilation, and air conditioning maintenance ("HVAC") position. At the first interview, he informed appellant's representative, Lori Keener, the property manager, that he was happy with his current, secure employment, but was interested in locating a position closer to his home. Appellant stated that Keener offered him $10 per hour plus medical

---

1. Appellant is also a cross-appellee in this appeal, but we will refer to it as "appellant" throughout the opinion.

2. Appellee has also brought a cross-appeal in this matter, but for the sake of clarity, we will refer to him as "appellee" throughout the opinion.

coverage, and he advised her that he needed to think about it. At a subsequent meeting, he advised Keener that upon consideration, he did not want to give up his secure, well-paying employment. Appellant stated that Keener's response was to increase the hourly pay rate to $11 per hour, and that she also asked him how long he planned to work at his current position. Appellant responded that he planned to work to age sixty-five. Keener then asked appellee how long would he plan on working for appellant. Appellee answered he would work until age seventy-two, and Keener allegedly responded, "Fine, [t]hat's what I want." Appellee then quit his job at Dairymens and began working for appellant at Victoria Place on or about May 18, 1992. Eight weeks later, appellant terminated appellee on July 21, 1992. Upon being informed by Keener of his termination, appellee responded "Well, that's just great. I left a good job to come here. I'm a 61 year [old] man, what in the hell am I going to do now?"

The jury returned a verdict in appellee's favor on the claim of promissory estoppel and in appellant's favor on the claim of implied-in-fact contract, deciding that appellee was not an employee at will and that appellant did not have just cause to terminate appellee. Appellant timely appealed, and submits the following assignments of error:

"[1.] The trial court erred in overruling [appellant's] motion for directed verdict at both the close of the [appellee's] case and at the conclusion of the evidence, as well as the [appellant's] motion for judgment notwithstanding the verdict.

"[2.] The trial court erred in overruling [appellant's] objections to the testimony of an economist regarding [appellee's] lost wages as well as his report of the same.

"[3.] The trial court erred by allowing the jury to consider the issue of damages despite [appellee's] failure to produce and keep necessary records making it impossible to assess those damages.

"[4.] The trial court failed to submit proper instructions to the jury regarding the doctrine of promissory estoppel as well as the calculation of damages."

Appellant presents two arguments under the first assignment: appellee failed to present sufficient evidence to establish a claim of promissory estoppel, and appellee failed to present evidence to establish the element of detrimental reliance. Upon review, we conclude that neither argument is well founded.

In *Sutherland v. Nationwide Gen. Ins. Co.* (1994), 96 Ohio App.3d 793, 800, 645 N.E.2d 1338, 1343, the court stated:

"In ruling upon a motion for judgment notwithstanding the verdict, the test to be applied by the trial court is the same test to be applied concerning a motion for directed verdict. *Posin v. A.B.C. Motor Court Hotel* (1976), 45 Ohio St.2d

271, 275, 74 O.O.2d 427, 430, 344 N.E.2d 334, 338. Under this test, the evidence adduced at trial and the facts set forth by admissions in the pleadings and record 'must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied.' *Id.* Further, '[n]either the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either of the above motions.' *Id.*"

The Supreme Court of Ohio has stated:

"It is the duty of a trial court to submit an essential issue to the jury when there *is* sufficient evidence relating to that issue to permit reasonable minds to reach different conclusions on that issue * * *." (Emphasis *sic.*) *O'Day v. Webb* (1972), 29 Ohio St.2d 215, 58 O.O.2d 424, 280 N.E.2d 896, paragraph four of the syllabus.

The law-of-the case doctrine provides as follows:

"There can be no question that where a judgment becomes final in the course of litigation, it becomes *res judicata* or the law of the case as to all questions therein decided. Where a second action or a retrial of an action is predicated on the same cause of action and is between the same parties as the first action or first trial of an action, a final judgment of an appellate court in the former action or the first trial of an action is conclusive in the second action or second trial of an action as to every issue which was or might have been presented and determined in the former instance." *Burton, Inc. v. Durkee* (1954), 162 Ohio St. 433, 438, 55 O.O. 247, 250, 123 N.E.2d 432, 435.

 "[T]he decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and [appellate] levels." *Nolan v. Nolan* (1984), 11 Ohio St.3d 1, 3, 11 OBR 1, 2–3, 462 N.E.2d 410, 412. "[T]he decision of an appellate court in a prior appeal will ordinarily be followed in a later appeal in the same case and court." *Id.* at 4, 11 OBR at 4, 462 N.E.2d at 413. This doctrine is designed "to avoid endless litigation by settling the issues" and "to compel trial courts to follow the mandates of reviewing courts." *Id.* at 3, 11 OBR at 3, 462 N.E.2d at 413.

The law of the case governing the instant appeal, regarding promissory estoppel, was stated by this court in *Patrick I* as follows:

"*Mers* [*v. Dispatch Printing Co.* (1985), 19 Ohio St.3d 100, 19 OBR 261, 483 N.E.2d 150] held that a demonstration of detrimental reliance on specific promises of job security can create another exception to the doctrine of employment at will. *Id.* at paragraph three of the syllabus; *Helmick v. Cincinnati Word Processing, Inc.* (1989), 45 Ohio St.3d 131, 136, 543 N.E.2d 1212, 1217. 'The test

in such cases is whether the employer should have reasonably expected its representation to be relied upon by its employee and, if so, whether the expected action or forbearance actually resulted and was detrimental to the employee.' *Mers* at paragraph three of the syllabus. Most important, 'the employer's representation is to be determined by what the "promisor should reasonably expect" the *employee* to believe the promise means if expected action or forbearance results.' (Emphasis *sic.*) *Mers*, 19 Ohio St.3d at 105, 19 OBR at 265, 483 N.E.2d at 154." *Patrick I*, 99. Ohio App.3d at 364–365, 650 N.E.2d at 930–931.

Recognizing that additional factors must also exist for a valid claim of promissory estoppel claim, we stated in *Patrick I*:

"This court has also acknowledged that without 'additional compelling factors constituting promissory estoppel,' the fact of an employee's giving up his or secure employment in reliance upon representations of the new employer would eliminate the doctrine of employment at will in an instance where an employee left a secure job to take a new job. *Romoser v. Amweld Bldg. Products, Inc.* (Feb. 15, 1991), Trumbull App. No. 89–T–4307, unreported, at 8 [1991 WL 18656]." *Id.*, 99 Ohio App.3d at 366, 650 N.E.2d at 931.

We concluded in *Patrick I* that the summary judgment evidentiary materials contained " 'additional compelling factors constituting promissory estoppel' which together [amounted] to specific promises of job security upon which [appellee] could have reasonably relied." *Patrick I*, 99 Ohio App.3d at 366, 650 N.E.2d at 931. Those factors included appellee's age, sixty-two; his desire to find employment closer to his home; appellee's fear of giving up the job security and salary he had with Dairymens; appellant's awareness of those factors when they interviewed appellee and when appellee rejected appellant's initial offer; appellant's awareness, as indicated in its affidavit and its response to appellee's interrogatories, that appellee would probably retire at age sixty-five if he continued working for Dairymens, whereas if he were to work for appellant, assuming an acceptable salary level, he would work until age seventy-two.

We observed that the critical issue was when the statements concerning appellant's working until age seventy-two were made, and which party made them. Then, having considered the facts adduced in the summary judgment evidential materials, we stated:

"Therefore, construing the evidence most favorably toward [appellee], when [appellant] responded 'that's what we want' or 'fine' [3] *after* [appellee] stated he would work until age seventy-two, [appellant] made a representation which it

---

3. Appellee testified concerning Keener's representations to him in a deposition that was taken on September 8, 1993.

should have reasonably expected [appellee] to believe meant he had a long-term, secure job, and that such representation would induce action by [appellee], to wit, that he would quit his job at Dairymens." (Emphasis and footnote added.) *Id.*

Thus, we decided that if the discussion about working until age seventy-two occurred after appellee had rejected the initial offer because of a concern about job security, the trial court could not grant summary judgment, and a factual issue existed which required jury consideration. *Id.* Appellant was bound by that preliminary determination upon remand to the trial court. Thus, the trial court properly overruled appellant's motion for directed verdict and correctly submitted the case to the jury in light of this court's prior determination regarding the adequacy of the summary judgment evidentiary material with regard to those issues.

A claim of promissory estoppel involves four elements: (1) there must be a clear and unambiguous promise, (2) the party to whom the promise was made must rely on it, (3) the reliance is reasonable and foreseeable, and (4) the party relying on the promise must have been injured by the reliance. *Doe v. Adkins* (1996), 110 Ohio App.3d 427, 437, 674 N.E.2d 731, 737–738. There must be a specific promise of continued employment from the employer to the employee. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, paragraph two of the syllabus, modified on other grounds in *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 662 N.E.2d 264.

Appellee testified that when he subsequently returned to Keener's office to advise that he was rejecting appellant's offer, the following discussion occurred:

"[APPELLEE] I told her, Mrs. Keener, thank you, Lori, but I don't want to give up money, I don't want to give up that security I have, I just bought my mobile home, didn't want to take a chance of losing it, I knew I was pretty secure where I was at.

"[MR. PEROTTI] And did Mrs. Keener have a response to that?

"[APPELLEE] Yes, she upped my offer to $11.[00] an hour, which was just a few cents under what I was making.

"[MR. PEROTTI] How did you feel about that as far as any—

"[APPELLEE] I felt good about that, I figured the money was there.

"[MR. PEROTTI] Did she say anything else to you as far as the security issue?

"[APPELLEE] She asked me if I stayed with Dairymens how long did I plan on working for Dairymens, and I told her to age 65.

"[MR. PEROTTI] Did she say anything else to you?

"[APPELLEE] She asked me at that point if I came to work for Victoria Place how long would you plan on working with us.

"[MR. PEROTTI] And what did you respond to her?

"[APPELLEE] I told her I would stay until I was 72.

"[MR. PEROTTI] What did she say in response to that?

"[APPELLEE] She said, 'Fine, that's what I want.'

"[MR. PEROTTI] And what did you do in response to that conversation?

"[APPELLEE] I accepted Lori's job offer.

"[MR. PEROTTI] And did you ask her for anything in writing?

" * * *

"[APPELLEE] No, we shook hands and I considered that a deal.

"[MR. PEROTTI] And in response to that, what did you do next?

"[APPELLEE] I—like I said, I accepted the job * * *."

On cross-examination, appellee's attorney asked Keener to read a portion of the transcript from a tape that appellee had secretly made without her knowledge:

"[MR. PEROTTI] If you would please take a look here and read to the jury the discussion between you and Mr. Patrick. That it starts out, 'Yeah, and then, uh, we did talk at the time when I come in that, you know, you asked me how long I'd work and I did say until 72.'

"Would you read to the jury what the response to that was?

"[KEENER] Yes."

During further cross-examination, Keener conceded that appellee had offered his services as an independent contractor on evenings and weekends so that he would not have to leave his full-time position with Dairymens, but that she had advised appellee that he would have to resign from his current employment in order to take her offer. Keener admitted that appellant was seeking a recognized contractor who would be able to supply appellant with replacement parts for their heating and air conditioning units, since they had no other source. She further acknowledged that appellant was "looking for ways to provide better service to [their] tenants in a cost effective manner." Keener also admitted that the contract with the former outside maintenance company had expired, and averred that appellant did not have any other company under contract at the time that appellee was hired. She acknowledged that she had signed a service invoice from Advance Maintenance dated April 16 or 17, 1992, for work done on appellant's Victoria Place property. Keener conceded that appellee was termi-

nated because appellant did not need him anymore. According to Keener, appellant had assumed that having someone on staff who could take care of the HVAC and electrical systems would be less expensive than having an outside company perform such duties, but appellant still had to call in an outside company because ultimately there were no cost savings. Additionally, Keener avowed that she had not informed appellee that appellant had entered into contracts for $26,000 and $51,000, each, for installation of heating and air conditioning units for which appellee would not be performing the maintenance. Keener further acknowledged that at the time of the interview, appellant was negotiating with Advance Maintenance for a full-time, permanent maintenance contract on all of appellant's units.

On direct examination, Kenner indicated that appellee had been terminated for his performance, citing equipment problems that he had encountered difficulty in repairing; however, on cross-examination she admitted that in response to a question posed by appellee's attorney during an earlier deposition, " 'the reason he was terminated did not relate at all to his performance, did it'?" she had answered " 'I have no idea.' "

We conclude that there was sufficient evidence presented at trial to support each element of appellee's promissory estoppel claim. The timing of Keener's statement is significant in several respects. The fact that Keener told appellee, "Fine, that's what I want" during the subsequent interview *after* appellee turned down Keener's initial offer, while expressing his reluctance to disturb his current employment situation, indicates that appellant's agent's representation was made with the intent to induce appellee to act on it. We think it is important that during the latter interview, appellant initiated and concluded the age discussion, beginning with a query probing appellee's expected or desired retirement age, and ending with appellant's responding affirmatively to appellee's answer. The fact that Keener immediately followed appellee's statement about working until age seventy-two with the words "Fine, that's what I want" was sufficient to allow appellee to believe that appellant was expressly avowing that appellee would work through age seventy-two. In our view, this sequence of events was adequate to indicate appellant's assent to a specific term of employment. Appellant's original question, viewed in conjunction with its final response, was promissory in nature. Moreover, Keener's phrase "Fine, that's what I want" was sufficiently clear and definite to reflect appellant's assent to a specific duration of employment for appellee. In our opinion, the entire exchange went beyond a simple discussion of future opportunity, and instead rose to the crest of what could be considered as a specific promise of continued employment. See *Wing,* 59 Ohio St.3d 108, 570 N.E.2d 1095, at paragraph two of the syllabus.

There is also evidence demonstrating that appellee relied to his detriment on appellant's statements. First, he relinquished a secure, satisfactory employment relationship, which apparently would have continued through age sixty-five, to take another job, and then was deprived of that position. Second, appellee departed his former employer with the expectation of earning seven years' worth of additional income at his newly secured position. Third, appellee's prospects for reemployment subsequent to his termination were significantly hampered by his age, as corroborated by his testimony that he was not able to secure other employment even after submitting numerous resumes and registering with the employment bureau.

 The existence or nonexistence of promissory estoppel essentially turns on the credibility of the witnesses. *Cervelli v. Health Ent. of Am., Inc.* (Feb. 8, 1991), Trumbull App. No. 89–T–4329, unreported, at 4, 1991 WL 16545. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact. *Bechtol v. Bechtol* (1990), 49 Ohio St.3d 21, 23, 550 N.E.2d 178, 180. The jury in this case decided that appellee's version of the events was more credible than appellant's agent's recitation, as it was entitled to do. We see no reason to disturb that determination. Accordingly, appellant's first assignment is without merit.

Appellant submits two arguments under the second assignment, first, that the trial court erred by allowing the expert witness, Dr. John Burke, to testify before any other evidence concerning the damages was introduced, *i.e.*, before Robert Patrick testified, and, second, that appellee's expert violated the Supreme Court's holding in *Worrell v. Multipress, Inc.* (1989), 45 Ohio St.3d 241, 543 N.E.2d 1277, and, as a result, presented to the jury figures that were not supported by the evidence. Neither of these assertions is well grounded.

 Evid.R. 703 and Evid.R. 705 both require that a proper factual foundation be laid before an expert opinion is rendered. *State v. Hinkle* (Aug. 23, 1996), Portage App. No. 95–P–0069, unreported, at 6, 1996 WL 494873. However, "[w]hile the testimony as to the facts underlying the expert's testimony should have been presented first, the courts of this state have held that the failure to present the evidence in the proper order will be considered harmless if evidence as to the underlying facts is eventually submitted. See, *e.g., Wells v. Miami Valley Hosp.* (1993), 90 Ohio App.3d 840, 857, 631 N.E.2d 642 [652–653]." *State v. Williams* (Mar. 24, 1995), Trumbull App. No. 89–T–4210, unreported, at 38, 1995 WL 237092, affirmed in part and reversed in part on other grounds, *State v. Williams* (1996), 74 Ohio St.3d 569, 660 N.E.2d 724.

Dr. Burke, who testified concerning appellee's total expectancy damages, stated that appellant's attorney provided him with a figure that estimated

appellee's subsequent income at approximately $5,000, which did not include a breakdown of the particular sources. He further testified that his calculations had not taken into consideration appellee's self-employment or reemployment income, but admitted that it would have been proper to have subtracted those amounts from his figures. Burke avowed that to obtain an accurate result, it would be necessary to calculate the present value of $5,000. He also related that if the actual $5,000 figure rather than the present value of that amount were subtracted, then there would be an overestimated subtraction that would be less, and that would work to appellee's detriment.

Appellee then testified concerning his income in mitigation that constituted the appropriate deductions from the damage award. During cross-examination, he stated that he had deposited into his bank account all of the money he had earned from Bob's Refrigeration, his pension checks from Ohio Rubber, the income earned from occasional side jobs, and unemployment compensation. Appellee related that he had worked for Anderson Door for approximately three months and earned $849 in that period, but had had to leave the company because his truck caught on fire and it was a risk to drive the truck. Appellee also stated that he earned $20 to $30 on occasional odd jobs, and that the total income from these noncontractual jobs approximated $4,500 from July 21, 1992 through July 21, 1993, $5,000 from 1993 through 1994, and $3,500 from 1994 through 1995. He presented his federal income tax return for 1992, and several W–2 forms. Later, the parties stipulated to the amounts of unemployment compensation received by appellee, $4,000 in 1992 and $3,587 from January through April 1993. Appellee further testified that his monthly Social Security benefit of $772 commenced in April 1993. On redirect examination, appellee related that $14,000 of the money deposited from August 1992 to December 1993 was from Bob's Refrigeration.

Consequently, although appellee's testimony concerning his reemployment efforts and his other income was not received until after Dr. Burke had already testified, the order of presentation does not constitute reversible error in the instant appeal, under the authority of *Wells*.

■ Turning to appellant's second argument under this assignment, the Eighth District Court of Appeals has held:

"A damage award in a promissory estoppel claim can be based upon reliance or expectancy damages. 1A Corbin, Corbin on Contracts (1963) 221, Section 200; *Mers v. Dispatch Printing Co.* (1988), 39 Ohio App.3d [99] at 105 [529 N.E.2d 958, at 965–966].

"The remedy is dependent on what justice requires. *Id.* The jury's finding of fact will not be upset as long as there is competent, credible evidence to support it. *C.E. Morris [Co.] v. Foley [Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d

261, 376 N.E.2d 578]." *Wallace v. Gray Drug, Inc.* (Aug. 23, 1990), Cuyahoga App. No. 57031, unreported, at 6, 1990 WL 121500. See, also, *Newkirk v. Precision Automotive, Inc.* (Mar. 3, 1992), Montgomery App. No. 12498, unreported, at 5, 1992 WL 41832.

■ Thus, under the authority of *Mers,* a damage award in a promissory estoppel claim can properly include expectancy damages. In this case, appellee's expectancy, based on his discussion with Keener, was that he would be employed until age seventy-two based on appellant's agent's indication that appellant also wanted appellee to work until age seventy-two. Accordingly, the expert's testimony regarding appellee's expectancy damages, calculated through age seventy-two, was not erroneous particularly when evidence concerning the appropriate deductions was also presented.

Contrary to appellant's assertion, the jury instruction on damages in the case *sub judice* did not contradict the law stated in *Worrell. Worrell* was primarily concerned with a claim of intentional discrimination in which no promise concerning a definite term of employment was made. Here, a promise of employment through a specific age was at issue. Appellant argues that *Worrell* stands solely for the proposition that a party should receive compensation only for the period until reemployment in the same or similar position. However, in *Worrell,* the court stated:

"[T]he usual remedy in breach of contract cases for wrongful discharge is to pay the injured party the difference between any wages due under the contract from the date of discharge until the contract term expires, and that amount is to be reduced by any wages the employee earned in subsequent employment. * * *" (Citations omitted.) *Id.,* 45 Ohio St.3d at 246, 543 N.E.2d at 1282.

■ The *Worrell* court held that "front pay"[4] was appropriate from the time of termination to the time of subsequent reemployment. *Id.,* 45 Ohio St.3d at 247, 543 N.E.2d at 1283. However, the court acknowledged that its decision did not restrict an award of "front pay *for a more extended period of time* in age discrimination suits filed pursuant to R.C. Chapter 4112, Civil Rights Commission." (Emphasis added.) *Id.* Thus, even the *Worrell* court recognized that an extended payment period may be required under certain circumstances.

Appellee asserts that if the employment relationship is for an *indefinite* period of time, the damages are calculated through the date of reemployment in a similar position. Conversely, where the parties undertake an employment rela-

---

4. "Front pay is an equitable remedy designed to financially compensate employees where 'reinstatement' of the employee would be impractical or inadequate. In such circumstances an award of front pay enables the court to make the injured party whole, although reinstatement is the preferred remedy." *Worrell,* 45 Ohio St.3d at 246, 543 N.E.2d at 1282.

tionship for a *specific* and *definite* term, damages are calculated based on the length of that term. This position is supported by the holdings in *Worrell* and *Mers*. Front pay, alone, is undeniably appropriate where no definite term is at stake, but where a definite, specific term is at issue, expectancy damages for the balance of the term are properly awarded. In conclusion, appellant's arguments under this assignment are not well founded. Appellant's second assignment of error is without merit.

Appellant's argument under the third assignment is that appellee failed to introduce records corroborating his income. We disagree.

In *State ex rel. Martin v. Columbus* (1979), 58 Ohio St.2d 261, 12 O.O.3d 268, 389 N.E.2d 1123, paragraph three of the syllabus, the court stated:

"The principle of mitigation of damages applicable in a suit to recover compensation for a period of wrongful exclusion from employment is an affirmative defense and the burden of proof on that issue resides upon the employer responsible for the wrongful discharge." See, also, *State ex·rel. Hamlin v. Collins* (1984), 9 Ohio St.3d 117, 119, 9 OBR 342, 343–344, 459 N.E.2d 520, 523.

Thus, the defendant/employer has the burden of proof on the issue of mitigation. Here, appellee testified regarding the money he had received from self-employment and a brief period of employment with Anderson Door. He further stated that the income he had received from the various sources had been deposited into his checking account. Defendant's Exhibit L contained records of appellee's bank account from 1992 through 1993. The parties stipulated to the amount of unemployment compensation, which was $4,009 in 1992 and $3,587 in 1993. Appellee testified that the income from his subsequent full-time employment with Anderson Door was $849 and that the amount of Social Security earnings per month was $772. Thus, while the records from appellee were not bookkeeping exemplars regarding his outside income, since he did not maintain a complete, formal ledger, the bank records nevertheless adequately substantiated appellee's mitigation efforts. Appellee's damages were proved with reasonable certainty. *Bemmes v. Pub. Emp. Retirement Bd.* (1995), 102 Ohio App.3d 782, 789, 658 N.E.2d 31, 35–36.

Moreover, appellant, bearing the burden of proof on mitigation, did not present any contradictory evidence from an expert of its own concerning a different amount of money that appellee could have, or should have, earned in the subject period. Therefore, appellant failed on its burden to show that appellee did not mitigate damages. We also note that the issue of mitigation would be moot if damages were awarded to age seventy-two, since appellee would have no incentive to mitigate damages based on his expectation of continued employment. Accordingly, appellant's third assignment of error is without merit.

Appellant presents three arguments under the fourth assignment. First, appellant contends that the trial court made directly inconsistent instructions with regard to the issue of reliance under the doctrine of promissory estoppel. Second, appellant argues that the trial judge refused to clarify certain instructions as given previously. Third, appellant submits that the court improperly instructed the jury as to the measure of damages. None of appellant's arguments is well founded.

In *Doyle v. Fairfield Machine Co., Inc.* (1997), 120 Ohio App.3d 192, 214–215, 697 N.E.2d 667, 681, this court stated:

"Erroneous jury instructions are not *per se* plain and reversible error. The relevant inquiry in determining whether erroneous jury instructions constitute plain and reversible error is 'whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights.' *Becker* [*v. Lake Cty. Mem. Hosp. W.* (1990) ] 53 Ohio St.3d [202] at 208, 560 N.E.2d 165 [at 171]. Stated slightly differently, the reviewing court's inquiry is whether 'but for the error, the outcome of the trial clearly would have been otherwise.' Further, the reviewing court is not to look at specific provisions of the jury instructions; rather, the court is to look at the totality of the jury charge in determining whether the erroneous portion of it is harmless or so prejudicial as to warrant reversal. Without a *timely* objection on the record, the prejudice allegedly created by the erroneous instructions must satisfy the plain error standard." (Citations omitted and emphasis added.)

 One question asked by the jury was:

"Are the underlined words on p. 10, possibly the wrong words. It appears to *us* that this changes the subjects in the middle of the paragraph.

"It seems that the paper is talking about prom. estoppel, but the words implied contract are stuck in the sentence by accident." (Emphasis added.)

Another question posed was:

"What are the definitions of

"1.) Implied Contract?

"and

"2.) Promissory Estoppel?

"The 10th page is a little unclear on what the page is referring to. Especially the part marked."

The instruction on promissory estoppel given in this case is substantially similar to the version in 3 Ohio Jury Instructions (1996), Section 302.01, which recites the law on promissory estoppel as set forth in *Mers,* and also to the

attorneys' submissions. Responding to the stated questions, the court acknowledged that the words "implied contract" had indeed been used where the phrase "promissory estoppel" should have been inserted. In response, the judge simply gave the jury the definition of implied contract. In our opinion, the trial court's response was not completely satisfactory, since it failed to explicitly address the question of whether the wrong phrase had been used. However, viewing the instruction in its totality, and considering the record as a whole, we cannot say that that failure by the trial court rendered the verdict defective. The jurors apparently resolved the ambiguity themselves on the basis of the additional implied-contract definition. The signed interrogatories reflect the jury's determination that appellee established promissory estoppel but failed to establish implied contract.

■ Additionally, the trial judge's instruction to the jury that it was not enough that appellee had quit his job in reliance on appellant's promise, but that additional compelling factors would have to be proved, is not an inconsistency or contradiction. Instead, these combined statements, as adopted from *Mers*, merely demonstrate that the employee carries an increased burden of proof and not a lesser burden as appellant suggests.

■ Turning to the trial court's response to the other questions, it is our view that the trial judge addressed these queries adequately. The first question received from the jury was "Can we use the depositions? If not, can we have the dates they were taken[?]" The trial judge's response was to reiterate that he had already given the jurors all of the applicable instructions, and then he advised them to reread the instructions and to apply the law to the case. The second question, composed of two parts, queried, "Does this being a contract, if agreed upon, neccesatate [*sic*] the age of employment to 72[?]" and "Can we have the transcripts from the actual trial since it was when we were all present anyway[?]" The court's response here was similar to its answer to the first question. These responses, while admittedly perfunctory, nevertheless fell within the realm of the trial court's sound discretion.

Finally, with regard to the jury instruction concerning damages,[5] the charge comported with the definition of damages as stated in *Mers* and *Worrell*. The analysis set forth in the second assignment on this issue is equally applicable

---

5. The damage instruction reads as follows: "Patrick's damages are the difference between any wages due under the contract from the date of firing until the length of time the contract was agreed to run. This amount shall be reduced by any income generated during this period, by any income that should have been generated by subsequent employment during this period or any unemployment compensation benefits received. In addition, wages earned after plaintiff's date of reemployment in a position of equal or similar status shall be subtracted from any damages awarded."

here. The damage instruction was not erroneous. Appellant's fourth assignment of error is without merit.

Finally, appellee/cross-appellant filed a notice of cross-appeal, but never filed an appellate brief in support of the cross-appeal. To request affirmative relief, appellee/cross-appellant was required to file a brief, as appellant, within twenty days after the date on which the clerk mailed the notice that the record was filed, unless extended by the court. App.R. 18(A); *Geiger v. Geiger* (1994), 96 Ohio App.3d 630, 637, 645 N.E.2d 818, 823. Pursuant to App.R. 18(C), appellee/cross-appellant's cross-appeal is hereby dismissed.

Appellant's assignments of error are without merit. The judgment of the trial court is affirmed.

*Judgment affirmed.*

WILLIAM M. O'NEILL and CACIOPPO, JJ., concur.

MARY CACIOPPO, J., retired, of the Ninth Appellate District, sitting by assignment.