**BLUEGRASS CENTER, LLC,**
**Plaintiff–Appellee,**

v.

**U.S. INTEC, INC., Defendant–**
**Appellant.**

No. 01–3313.

United States Court of Appeals,
Sixth Circuit.

Oct. 9, 2002.

Before RALPH B. GUY, JR., SILER, and BATCHELDER, Circuit Judges.

PER CURIAM.

Defendant, U.S. Intec, Inc. (Intec), appeals from the judgment entered after a bench trial in favor of plaintiff, Bluegrass Center, LLC (Bluegrass). Bluegrass sought damages for the alleged faulty installation of an Intec roof. Bluegrass

claimed negligence in the training of the installer and breach of guarantee, but the judgment entered was based on promissory estoppel. Intec challenges the judgment because promissory estoppel was not pleaded in the complaint. Intec also argues that Bluegrass did not prove promissory estoppel, that the district court relied on improperly admitted parole evidence, and that the damages awarded were excessive. Finally, Intec appeals from the denial of summary judgment prior to trial. After review of the record, the applicable law, and the arguments presented on appeal, we affirm.

I.

Bluegrass owned a shopping center in Maysville, Kentucky. Bluegrass sought bids to replace the center's roof and required that the new roof be guaranteed under a warranty. Randy Jewell from Jewell Construction (Jewell) submitted a bid and proposed to install an Intec roof with a 12–year factory warranty. Bernard Hackman, Bluegrass's managing partner, testified that Bluegrass wanted assurances before awarding the roofing contract to Jewell. The district court described those assurances as follows: (1) Jewell would become certified by Intec; (2) Intec would instruct Jewell on how to correctly install the Intec roof; and (3) Intec would issue the 12–year factory warranty after installation.

Bluegrass knew that Jewell was not an experienced roofer and was not certified by Intec. Intec would issue the warranty only if the roof was installed by a certified contractor. Hackman testified that Bluegrass was "very concerned about [Jewell's] ability to do a job this size" and wanted assurance that Intec would "stand by [Jewell's] work." Hackman talked to Larry Villers, an Intec salesperson, about these concerns and requirements. Villers reassured Hackman that "he was going to be with Jewell, not only for the certification, but the completion of the job." Villers sent a letter to Jewell to document the assurances. The letter stated in part:

> As per our conversation, the question arose that the property owner questioned how much time would be spent on this project by a person from U.S. Intec. Please assure your property owner that I will work with you on the start of the project to get you going and I'll make several visits back to the property to assure your building owner that he will get a good installation. This is a twofold process for me to follow up on this project: U.S. Intec knows they have a good roofing product but they also know that it is only as good as the roofer installing it. We rely a lot on customers such as yourself to refer our roofing products to other customers and we know that if you do not get a good roof application we do not get another satisfied customer referral. Randy please let your customer know if he has any questions, he can give me a call. . . .

Villers assumed that Jewell would submit this letter to Bluegrass. He commonly wrote such letters to help a contractor "consummate a deal."

Intec later issued a "Certificate of Merit" indicating that Jewell had been approved as a "certified applicator." Intec described its certification process as a review of the contractor's financial information and roofing experience. In some cases, Intec also reviewed prior roof installations completed by the contractor. Intec, however, does not point to any evidence in the record that shows whether Intec followed its usual procedures in certifying Jewell. Villers testified that he was not involved in the certification of installers and did not remember anything

about Jewell's certification.[1] Jewell provided financial information to Intec, but did not know whether Intec checked work references or inspected prior roof installations. Villers thought he may have visited a hospital where Jewell installed a roof, but did not know whether or not he went up on the roof.

Hackman relied on both Villers's letter and Jewell's certification in awarding the roofing contract to Jewell. Another Bluegrass partner, Neal Hatcher, testified that Jewell was chosen because "we knew that he was going to do the job correctly, because he was going to be supervised on how to do the roofing."

Jewell received no instruction before either being certified or beginning installation of the roof on the shopping center. Villers was at the job site for the first several days and helped install the first few roof sections. Villers told Hackman that he was there to instruct Jewell on the proper installation of the roof. Jewell testified that Villers showed him how to install the roof, including how to torch the seams and how to space the screws to attach the base. Jewell followed this pattern for spacing of the screws throughout the job. Villers stopped by approximately every two weeks to inspect the progress, and spoke to Jewel by telephone once or twice a week between the site visits. Jewell testified that he installed the roof exactly as Villers had instructed him.

While Villers testified that it was standard procedure for an Intec specification manual to be mailed to installers, Intec does not point to any evidence in the record suggesting that one was mailed to or received by Jewell. Villers did not remember whether he gave the manual to Jewell. Jewell testified that he did not receive any instructions before he was cer-

tified, and that the only instructions he received were Villers's oral directions.

The roof leaked before, during, and after installation. Jewell had numerous conversations with Villers about the leaks. Jewell caulked gaps he found in the parapet walls on the roof, but the leaking continued. Jewell then thought that the leaks were coming from separated seams. Villers advised Jewell to stop the leaks by retorching the membrane seals to reseal them. Villers was present for some of this retorching. Jewell observed that the leaking stopped around the retorched areas.

When a tenant complained to Hackman about leaks, Hackman discussed the problem with Jewell and Villers. Villers told him that the membrane sometimes "would not adhere to itself." Bluegrass refused to make the final payment to Jewell until Intec assured it that the installation was proper, and that there were no more leaks. After an inspection, Craig Noble of Intec told Hackman that everything was fine. Hackman asked Noble whether the roof had been properly installed, and he said yes. Intec sent a fax to Jewell stating "We have completed the roof inspection . . . the roof passed."

Relying on Noble's representations and the fax, Bluegrass released the final payment to Jewell. The written guarantee was issued and signed by Jewell; Jeff Dever, another partner from Bluegrass; and Noble on behalf of Intec. The guarantee stated:

> U.S. Intec, Inc. ("Intec") guarantees to the original building owner that, subject to the terms and conditions of this guarantee, it will repair or replace, AT ITS SOLE DISCRETION, the Intec roofing membranes and base flashing, or portions thereof, as is necessary to correct

1.  Intec destroyed or lost whatever records it may have had on Jewell's certification.

leaks resulting from the causes listed below, for the guarantee term. . . .

Intec will repair leaks caused by: (1) manufacturing defects, (2) deterioration as a result of ordinary wear and tear from exposure to the elements, (3) splits, fissures or tears not caused by structural or roof deck movement or failure, or (4) workmanship in installing the roofing membranes and base flashings.

The remedies section stated:

The remedy set forth in this guarantee shall be the SOLE AND EXCLUSIVE REMEDY available to the owner. The owner and roofing contractor expressly agree that, IF THE OWNER DISCOVERS or should have discovered WITHIN THE FIRST TWO YEARS after validation of this guarantee by Intec LEAKS IN THE MEMBRANE OR BASE FLASHINGS DUE TO MISAPPLICATION OR TO THE ROOFER'S FAILURE TO INSTALL THE MEMBRANE AND BASE FLASHINGS IN COMPLIANCE WITH THE INTEC SPECIFICATION MANUAL IN EFFECT AT THE TIME THE ROOF WAS INSTALLED, IT IS THE ROOFING CONTRACTOR'S SOLE RESPONSIBILITY TO REPAIR THOSE LEAKS. Intec shall have no obligation to repair such leaks.

The guarantee also contained the following language:

THIS GUARANTEE IS EXPRESSLY IN LIEU OF ANY OTHER GUARANTEES OR WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE, AND OF ANY OTHER OBLIGATION OR LIABILITY ON THE PART OF U.S. INTEC, INC., WHETHER ANY CLAIM IS BASED UPON STRICT LIABILITY, NEGLIGENCE, BREACH OF WARRANTY OR ANY OTHER THEORY OR CAUSE OF ACTION.

The guarantee provided that: "The fact that Intec may make inspections of the roof system during and after application does not affect the roofing contractor's obligation to properly install the Intec roofing membrane and base flashing and does not constitute a waiver of any of the terms and conditions of this guarantee." Finally, the guarantee stated that: "No representative, employee or agent of Intec or any other person has any authority to assume for Intec any additional or other liability or responsibility in connection with the roof described above." The guarantee did not contain an integration clause.

Shortly after the guarantee was issued, the roof began to leak. Hackman called Noble, who told him to call Jewell because the leaks were not Intec's responsibility. Hackman told Noble that Jewell was not available because he had filed for bankruptcy. Noble then said that the leaks were caused by the HVAC units and the parapet walls, and that it was the building owner's responsibility to repair them in order to stop the leaks.

Bluegrass hired another contractor, Tom Jenkins, to repair the leaks. Jenkins covered the parapet walls with a membrane, but the leaks continued. Intec subsequently conducted more inspections and informed Bluegrass that there were no problems with the Intec roof, but that any leaks were originating at the walls and the HVAC units. Jenkins testified at trial that the roof leaked because (1) the screws that fastened the insulation to the existing boards were spaced too far apart, and (2) the seams had torn apart. Gary Voight, an Intec employee, testified that the specification manual required the screws to be placed in patterns of 12, 18, and 20 inches apart. Jenkins testified that the screws were placed four to six feet apart. Jenkins

opined that the roof of the shopping center would continue to leak unless the entire roof was replaced.

Intec did not present any independent expert witnesses. Voight testified that the leaks were caused by problems with the HVAC units and parapet walls as well as with Jenkins's repair attempts. The district court did not find Voight's testimony to be credible because of his "relative inexperience and bias in favor of his employer." Intec does not challenge this finding on appeal.

Bluegrass filed a complaint alleging negligent instruction, negligent manufacture, and breach of guarantee. The district court denied Intec's motion for summary judgment. At the beginning of trial, Bluegrass dropped the negligent manufacture claim. In opening and closing arguments, Bluegrass identified its theories of recovery as negligent training and breach of guarantee. After the bench trial, the district court issued a written opinion and entered judgment for Bluegrass based on the theory of promissory estoppel. The district court did not address the theories of negligent training or breach of guarantee. The district court denied Intec's motion to amend the court's findings of fact and conclusions of law. This appeal followed.

## II.

On appeal from a bench trial, we review *de novo* the district court's interpretation of the relevant law, but review its factual findings for clear error only. *Regensburger v. City of Bowling Green,* 278 F.3d 588, 592 (6th Cir.2002). A finding of fact will be deemed clearly erroneous only when it is against the clear weight of the evidence or when upon review of the evidence, the appellate court is left with the definite and firm conviction that a mistake has been committed. *Smoot v. United Transp. Un-*

ion, 246 F.3d 633, 641 (6th Cir.), *cert. denied,* —— U.S. ——, 122 S.Ct. 476, 151 L.Ed.2d 390 (2001). " 'When factual findings rest upon credibility determinations, this Court affords great deference to the findings of the district court.' " *Id.* (quoting *Schroyer v. Frankel,* 197 F.3d 1170, 1173 (6th Cir.1999)).

Intec challenges the denial of its motion for summary judgment. Generally, however, a denial of summary judgment is not reviewable after a trial on the merits. *Jarrett v. Epperly,* 896 F.2d 1013, 1016 (6th Cir.1990). We, therefore, turn to the remaining issues.

## A. Promissory Estoppel Not Pleaded

■ Intec argues that under Ohio rules of procedure, a claim of promissory estoppel must be pleaded as a separate cause in a breach of contract complaint. The Ohio law cited by Intec is not controlling because this case is governed by the Federal Rules of Civil Procedure. Under federal notice pleading standards, pleadings must contain either direct or inferential allegations with respect to all the material elements to sustain a recovery under some viable legal theory. *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988).

Intec argues that the district court could not *sua sponte* amend the pleadings to add a promissory estoppel claim. Amendments to conform the pleadings to the evidence are addressed in Fed.R.Civ.P. 15(b), which states:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon

motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits.

The district court, however, did not rely on Rule 15(b) in granting relief to Bluegrass under the promissory estoppel theory. It relied on Fed.R.Civ.P. 54(c), which provides in part that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings."

In *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 714 (8th Cir.1979), the Eighth Circuit held that "the federal rules, and the decisions construing them, evince a belief that when a party has a valid claim, he should recover on it regardless of his counsel's failure to perceive the true basis of the claim at the pleading stage . . .' provided that such a shift in the thrust of the case does not work to the prejudice of the opposing party." (quoting 5 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1219 at 145 (1969)). As the Eighth Circuit has explained, *Oglala Sioux* stands for the proposition that

> a party may obtain relief on a theory of recovery not expressly pleaded in the

complaint but proved at trial, when it is based on the same wrongful act that was pleaded, and when the opposing party has had fair notice. *See Oglala Sioux,* 603 F.2d at 714 (theory of recovery raised in post-trial brief was based on same wrongful act alleged in complaint).

*Morgan Distributing Co. v. Unidynamic Corp.,* 868 F.2d 992, 995 (8th Cir.1989). This court has adopted the reasoning set forth in *Oglala Sioux. See Colonial Refrigerated Transp., Inc. v. Worsham,* 705 F.2d 821, 824–25 (6th Cir.1983) (affirming judgment on an implied indemnity theory when the complaint alleged a claim under the express indemnity provisions of a lease).[2]

■ Intec argues it did not consent to the theory of promissory estoppel being part of plaintiff's case and, in fact, objected to it at closing argument. Rule 54(c) does not require the consent of the parties as does Rule 15(b). The courts, however, have imposed a requirement of no prejudice to the opposing party even under Rule 54(c). *Oglala,* 603 F.2d at 714. Intec argues that prejudice should be presumed because it did not have notice. The record demonstrates, however, that Intec did have notice of the facts upon which Bluegrass sought relief, and that is all that is required under notice pleading. Despite having labeled its theory as one of "negligent training," Bluegrass alleged and argued each of the factual elements of promissory estoppel throughout the case. *See Matter of Hannover Corp. of America,* 67 F.3d 70, 75 (5th Cir.1995) (recovery allowed under Rule 54(c) because pretrial order clearly identified disputed issue).

In order to prove promissory estoppel under Ohio law, a plaintiff must demon-

---

**2.** *See also Fasano/Harriss Pie Co. v. Food Mktg. Assocs., Ltd.,* No. 87–1257, 1988 WL 44738 (6th Cir. May 9, 1988) (unpublished disposition) (district court properly granted judgment under Rule 54(c) on equitable theory of quasi-contract or unjust enrichment where plaintiff pleaded breach of contract).

strate the following elements: (1) a promise, clear and unambiguous in its terms; (2) reliance on the promise by the party to whom the promise is made; (3) such reliance must be reasonable and foreseeable; and (4) the party claiming estoppel must be injured by the reliance. *Weiper v. W.A. Hill & Assocs.*, 104 Ohio App.3d 250, 661 N.E.2d 796, 803 (1995).

The complaint stated that Intec was to "supply the Plaintiff and its contractors, technical expertise on installation procedures, which was undertaken" by Intec, and that defects in the roof were caused by Intec's agent's negligence "in that improper instructions were given in the installation procedures, thereby causing defects in the said roof." In answers to interrogatories, Bluegrass stated: "Mr. Villers indicated to Bernard Hackman as an inducement to use the U.S. Intec roofing system that he would be present the first three (3) days of installation and then be present approximately once every week in order to verify proper installation of the roofing." Bluegrass also stated that Villers told Hackman that if Jewell was selected as the contractor, Villers "would insure that the work was done properly by means of providing installation instructions to Jewell Construction."

In its brief in response to the summary judgment motion, Bluegrass argued:

Additionally, Bluegrass Center, LLC was assured by both Jewell Construction and Defendant ... that Jewell Construction was capable of installing the system.... Intec also warranted they would actively participate in the installation process and offer technical expertise.... Bluegrass Center, LLC specifically relied upon those representations. Defendant ... became involved in the early stages of the negotiations and assured Plaintiff that it would offer its technical expertise in installation, and in

fact would be on site at the startup of the project and throughout the project.... It was upon these representations that Bluegrass Center, LLC chose Jewell Construction for the awarding of the bid.

Then, in proposed findings of fact and conclusions of law, Bluegrass stated:

Defendant represented to Plaintiff that if it chose Jewell Construction as its roofing contractor and its roofing system, they would provide technical expertise and train Jewell Construction on the job.

Plaintiff materially relied upon the representations of the Defendant with respect to providing technical expertise and its certification of Jewell Construction as a certified installer of U.S. Intec products.

Further, the final pretrial order stated:

Plaintiff's Claims: Plaintiff claims that Defendant was negligent in ... providing technical expertise in the installation of the roofing system. Plaintiff also claims Defendant negligently certified Jewell Construction as a certified installer of its roofing materials and as a result, Plaintiff relied upon this certification in choosing Jewell Construction as its roofing contractor.

Whatever label plaintiff's counsel placed on the theory, Intec had repeated notice that Bluegrass was alleging (1) a promise to train Jewell to correctly install the roof; (2) reliance on that promise in awarding the roofing contract to Jewell; (3) the reliance was anticipated and known by Villers; and (4) injury to Bluegrass when Jewell was not properly trained, and the roof was not correctly installed. In trying to prove negligent training, Bluegrass offered evidence at trial that was also relevant to establishing the elements of promissory estoppel. Intec was fully aware of this evidence. The essence of a claim is its factual elements. *See Gilbane Bldg. Co. v.*

*Fed. Reserve Bank,* 80 F.3d 895 (4th Cir. 1996). Specifying an incorrect legal theory is not fatal. *See Bartholet v. Reishauer A.G. (Zurich),* 953 F.2d 1073, 1078 (7th Cir.1992).

Intec also argues that if it had known that the certification and the Villers letter were at issue, it would have developed additional evidence about them. However, the final pretrial order identified the certification as significant to Bluegrass's claim. Intec presented evidence on the certification process, and what it meant. Indeed, Intec relies on this evidence in presenting arguments to this court on the issue of whether plaintiff is entitled to relief under the theory of promissory estoppel.

The significance of Villers's letter to Bluegrass's claim was also no surprise. The letter was attached to and discussed in the brief in opposition to the motion for summary judgment. It was described as part of the assurance Bluegrass received and relied upon in granting the roofing contract to Jewell. At trial, Intec questioned Villers about the extent and meaning of the letter. Intec, therefore, not only had notice that the Villers letter and the certification were at issue, but also took the opportunity to present evidence relating to them.

Defendant's final allegation of prejudice is without merit. Intec claims that it would have called Dever, the Bluegrass partner who signed the guarantee, to testify about the execution of the guarantee. Intec knew that Dever signed the guarantee. Evidence concerning the actions of Bluegrass leading up to the execution of the guarantee was received through Hackman, its managing partner. While it is hard to see how Dever's testimony about the execution of the guarantee would have made a difference, the factual allegations were clearly identified before and throughout the trial. Intec certainly could have called Dever to ask him about signing the

guarantee. We find, therefore, that the district judge could properly consider whether Bluegrass was entitled to relief under the theory of promissory estoppel pursuant to Rule 54(c).

**B. Parole Evidence**

On the first day of trial, Intec moved to exclude parole evidence relating to representations made prior to the execution of the guarantee. Intec argues that the district court improperly admitted and relied on this parole evidence to vary the terms of the guarantee. We review evidentiary rulings for abuse of discretion. *Burzynski v. Cohen,* 264 F.3d 611, 621 (6th Cir.2001).

Under the parole evidence rule, an oral agreement cannot be enforced in preference to a signed writing that pertains to exactly the same subject matter, yet has different terms. *Ed Schory & Sons, Inc. v. Soc. Nat'l Bank,* 75 Ohio St.3d 433, 662 N.E.2d 1074, 1080 (1996). Further, promissory estoppel does not apply to oral statements made prior to the written contract, when the contract covers the same subject matter. *Borowski v. State Chem. Mfg. Co.,* 97 Ohio App.3d 635, 647 N.E.2d 230, 235 (1994). "[W]here ... the performance which is said to satisfy the detrimental reliance requirement of the promissory estoppel theory is the same performance which represents consideration for the written contract, the doctrine of promissory estoppel is not applicable." *Gen. Aviation, Inc. v. Cessna Aircraft Co.,* 915 F.2d 1038, 1042 (6th Cir. 1990) (internal quotation marks and citation omitted).

We agree with the district court that Intec's promise to train Jewell was not included in the subject matter of the guarantee. The guarantee addresses the respective responsibilities of the installer and Intec for misapplication and installation problems. The guarantee does not address or cover the training of the instal-

ler. The proper training of the roofing contractor was a separate promise made by Intec that induced Bluegrass to select Jewell as the roofing contractor. Once the roofing contractor was properly trained in the installation of the roof, then the guarantee controlled the respective responsibilities of the installer and Intec for leaks caused by a misapplication or installation problem.

Intec argues that admitting the salesman's statements regarding training is in contravention of the guarantee's express terms which disclaim any warranty or promise not memorialized in its four corners. The guarantee does expressly disclaim any other guarantees, warranties or liabilities. It does not, however, have an integration clause that states that the guarantee contains the entire agreement and that there are no prior agreements or understandings between the parties. When parties have a contractual agreement which includes an integration of the contract, a court may not turn to parole evidence for the purpose of varying or contradicting the written words of the contract. *Ed Schory & Sons*, 662 N.E.2d at 1080. In the absence of an integration clause, however, parole evidence is admissible to show a supplemental promise which does not contradict or vary the terms contained within the guaranty. The guarantee and its disclaimer cover misapplication and installation issues-not the separate, prior promise to train Jewell. The district court did not err in admitting and considering evidence of a promise to train Jewell on how to install the Intec roof.

## C. Elements of Promissory Estoppel

Intec argues that Bluegrass failed to prove either that there was a clear and unambiguous promise, or that its reliance on the alleged promise was reasonable. Intec claims that Bluegrass did not identify any specific language supporting the alleged promise to instruct Jewell. Intec argues that Villers's letter makes absolutely no mention of any promise to train Jewell on roofing procedure.

■ "The existence or nonexistence of promissory estoppel essentially turns on the credibility of the witnesses." *Patrick v. Painesville Commercial Props., Inc.*, 123 Ohio App.3d 575, 704 N.E.2d 1249, 1255 (1997). After review of the record, we conclude that the district court's finding that Intec promised to instruct Jewell on the proper installation of the roof is not against the clear weight of the evidence. Our review of the evidence also does not leave us with the definite and firm conviction that a mistake has been committed.

Hackman, the managing partner of Bluegrass, testified that Villers "reassured me that he was going to be with Jewell, not only for the certification, but the completion of the job." Hatcher, another Bluegrass partner, testified that Jewell was chosen because he was "going to be supervised on how to do the roofing." Hackman also testified that Villers told him on the first day of installation that he was there to instruct Jewell on the proper installation of the roof.

Villers's letter stated in pertinent part: "I will work with you ... to assure your building owner that he will *get a good installation.*" (Emphasis added.) While the letter does not contain the words "I promise to instruct and train Jewell," the language of the letter and the testimony of the Bluegrass partners supports the district court's finding that Intec, through Villers, made a clear and unambiguous promise to Bluegrass that Intec would instruct Jewell on how to install the Intec roof so that Bluegrass would "get a good installation."

Intec argues that Bluegrass's reliance was not reasonable because Bluegrass could not have expected the single day that Villers spent attempting to instruct Jewell

on the installation of the Intec roof would provide the requisite experience that Jewell otherwise lacked. To the contrary, Bluegrass's knowledge of Jewell's inexperience supports the finding that Bluegrass's reliance on Intec's promise to instruct was reasonable and foreseeable. We agree with the district court that it makes logical sense that a building owner would believe that the manufacturer could instruct a contractor on how to install the manufacturer's roof. Jewell testified that his previous employer was instructed by Villers on Intec roof installation. Villers testified that it was part of his job to show contractors how to install Intec materials. Villers stated in his letter that Intec had an interest in making sure the roof was correctly installed because "if you do not get a good roof application, we do not get another satisfied customer referral." This evidence supports the district court's finding that Bluegrass's reliance on Intec's promise to instruct Jewell on the proper installation of the Intec roof was reasonable.

Finally, Intec argues that to the extent the statements in the letter constitute a promise that induced Bluegrass to hire Jewell, Intec fulfilled those promises. The district court concluded that while Intec certified Jewell, that certification did not fulfill Intec's promise because Jewell was certified even though he had absolutely no knowledge of how to install the Intec roof.

We affirm the district court's judgment because Intec failed to fulfill its promise to instruct Jewell on how to correctly install the roof. Villers promised not only to assist Jewell in getting certified, but also to be present at the site to instruct Jewell in order to assure Bluegrass that it would get a good installation. On appeal, Intec does not challenge the district court's finding that Villers instructed Jewell on how to install the Intec roof, that Jewell followed

those instructions, and that the instructions were incorrect and resulted in the faulty installation of the roof. Instead, Intec argues that Villers fulfilled the promise in the letter because he was present at the site at the beginning of the installation. To accept this argument, we would have to completely ignore the reason Villers gave for assuring Bluegrass he would be present: to instruct Jewell on how to correctly install the roof to "assure your building owner that he will get a good installation." The district court's finding that Bluegrass was injured by its reliance upon Intec's unfulfilled promise is supported by the evidence presented at trial.

D. Damages

The Intec roof was installed in sections separated by the parapet walls. The district court awarded damages for the replacement cost of the entire roof.[3] In a promissory estoppel action, the court can award either reliance damages or expectancy damages. The district court granted reliance damages in this case. Intec's failure to properly instruct Jewell resulted in the faulty installation of the roof. Reliance damages represent the detriment the promissee incurred by changing its position. *See ZBS Indus., Inc. v. Anthony Cocca Videoland, Inc.*, 93 Ohio App.3d 101, 637 N.E.2d 956, 960 (1994). The cost of repairing the deficient work, therefore, is the proper measure of reliance damages needed to give Bluegrass the benefit of the proper performance of Intec's promise. *See McCray v. Clinton County Home Improvement*, 125 Ohio App.3d 521, 708 N.E.2d 1075, 1076 (1998).

■ Intec claims that there was no evidence presented that all the sections leaked after the roof was installed and the guarantee was issued. Thus, Intec argues, it was improper for the district court to

---

**3.** In calculating the damages, the district court took into consideration the amount already spent by Bluegrass on the replacement of certain roof sections before trial.

grant damages covering the cost of replacing the entire roof of the shopping center. Bluegrass's expert witness, Jenkins, testified that the entire roof of the shopping center needed to be replaced or it would continue to experience leaks. Intec did not offer any evidence to rebut this testimony. In fact, it did not present any testimony or evidence on damages. It relies solely on the testimony of Hackman and the Jenkins invoices to argue that some roof sections were not leaking. The district court did not err in choosing to accept the testimony of Bluegrass's expert. The district court's finding that leaks would occur in the future unless the entire roof was replaced is not against the clear weight of the evidence.

AFFIRMED.