*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0298P (6th Cir.)
File Name: 03a0298p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

ROBERT H. MEYERS, M.D.,
Individually and as a
Partnership; MARY MEYERS,
M.D., Individually and as a
Partnership,
    *Plaintiffs-Appellants/*
*Cross-Appellees,*

    *v.*

COLUMBIA/HCA
HEALTHCARE CORPORATION,
et al.,
    *Defendants-Appellees/*
*Cross-Appellants.*

Nos. 01-6190/6217

Appeal from the United States District Court
for the Western District of Kentucky at Bowling Green.
No. 97-00219—Joseph H. McKinley, Jr., District Judge.

Argued: May 2, 2003

Decided and Filed: August 20, 2003

---

2   *Meyers, et al. v. Columbia/HCA*   Nos. 01-6190/6217
   *Healthcare Corp., et al.*

Before: CLAY and GIBBONS, Circuit Judges;
CLELAND, District Judge.[*]

---

## COUNSEL

**ARGUED:** Tom Curtis, CURTIS & KIRKPATRICK, Pasadena, California, for Appellants. Charles J. Cronan IV, STITES & HARBISON, Louisville, Kentucky, for Appellees. **ON BRIEF:** Tom Curtis, CURTIS & KIRKPATRICK, Pasadena, California, for Appellants. Charles J. Cronan IV, Margaret R. Appenfelder, STITES & HARBISON, Louisville, Kentucky, for Appellees.

---

## OPINION

CLELAND, District Judge. Plaintiffs-appellants Dr. Robert Meyers ("Meyers") and his wife, Dr. Mary Meyers, initiated this action against multiple defendants after the Board of Trustees of Logan Memorial Hospital denied Meyers' reappointment to the hospital's medical staff. The district court granted summary judgment in favor of defendants, finding that they were immune under the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. § 11101 *et seq.* Defendants moved for an award of costs and attorney's fees under the HCQIA, and the district court denied their motion. Plaintiffs appeal the grant of summary judgment; defendants cross-appeal the denial of costs and fees. We affirm the judgment of the district court on both issues.

---

[*]The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

## I. FACTS [1]

On March 25, 1991, Meyers applied for medical staff privileges at Logan Memorial Hospital, Inc. ("LMH") in Russellville, Kentucky. Shortly thereafter, the Credentials Committee and the Medical Executive Committee ("MEC") approved Meyers for staff privileges. As a result, in September 1991, the LMH Board of Trustees ("Board") approved Meyers for appointment to the medical staff. Pursuant to the LMH Bylaws, all initial appointments to the medical staff were provisional for one year. At the end of that year the physician would be reevaluated to qualify for advancement from associate to active member status.

In the fall of 1992, the Credentials Committee began to evaluate Meyers for his advancement to active staff privileges. On April 12, 1993, the Credentials Committee, which Meyers argues was composed largely of his competitors, voted to deny him staff privileges. In its decision, the committee cited concerns about Meyers' history of moving from hospital to hospital following disputes with hospital staff,[2] his failure to timely and fully disclose

---

[1] We find the district court's statement of facts to be accurate, and accordingly adopt it as our own.

[2] Meyers had privileges from 1981-82 at The Memorial Hospital in North Conway, New Hampshire, but maintains that he was forced to leave due to "political dynamics" upon establishing his "large, successful practice." Meyers then worked as a trauma surgeon from 1983-84 in Fort Bragg, North Carolina. From 1984-88, Meyers practiced in Spruce Pine, North Carolina until he got "burned out." In 1988, Meyers moved to Wytheville, Virginia, and practiced at Wythe County Community Hospital ("WCCH"). He was suspended from WCCH in July 1989. Meyers was later reinstated to the WCCH staff but took a leave of absence and voluntarily left the hospital. Meyers then obtained provisional privileges in 1990 at Clark Regional Medical Center ("CRMC") in Winchester, Kentucky. Meyers alleges that he left CRMC because his plan to reestablish the practice of a departed orthopedic surgeon was

---

disciplinary and corrective action taken against him while working in Virginia,[3] and the quality of his patient care. At this point, pursuant to LMH Bylaws, the Credentials Committee was to notify Meyers of the general nature of its concerns and arrange a meeting with Meyers. The Credentials Committee did, on short notice, invite Meyers to a meeting. According to Fred Mudge, a member of the Board, this invitation did not comply with the Bylaws.

On June 3, 1993, the MEC, half of whose members were also members of the Credentials Committee, voted to accept the Credentials Committee decision and revoke Meyers' staff privileges. Neither of these committees, however, had the power to grant or deny privileges to Meyers. The MEC was to consider the recommendation from the Credentials Committee and make a recommendation to the Board, which had the ultimate authority to grant, deny, or terminate Meyers' privileges.

On January 24, 1994, the Board informed Meyers that it was assuming full responsibility for determining his reappointment and advancement to active staff because of his

---

sabotaged by a group of Lexington physicians. On the other hand, a letter from CRMC's administrator suggests that Meyers left because he did not work harmoniously with other members of the hospital staff. The administrator also noted that he did not maintain medical records in accordance with staff rules and regulations.

[3] Meyers was censured and placed under a corrective action plan ("CAP") by the Medical Society of Virginia Review Organization ("MSVRO") for failure to keep sufficient medical records. Meyers argues that he completed the CAP and his license was in no way affected by the MSVRO. Defendants maintain that he failed to disclose this information by answering "no" to the following questions on his initial application: "Has your license to practice medicine in any jurisdiction ever been limited, suspended or revoked?" and "Have you ever been denied membership or renewal thereof, or been subject to disciplinary action in any medical organization?"

concerns with the manner in which the peer review process was being handled. Three members of the Board, acting as a Credentials Committee, conducted an independent review. This committee discussed concerns about Meyers' behavior and inability to get along with others in addition to questions about his surgical technique. The committee gave Meyers the opportunity to put forth additional information, but he maintained that there was none. The committee questioned Meyers about several incident reports concerning disruptive behavior, his history of problems at other hospitals, his failure to timely complete medical records, his hostility towards the operation room staff, reports of breaking the sterile field, and his failure to provide appropriate coverage for patients while he was out of town. Meyers acknowledged that he had a personality problem.

At the same time, the Kentucky Cabinet for Human Resources Drug Control Division was investigating Meyers' prescription practices pursuant to complaints from pharmacists and the Kentucky State Police about the volume of prescriptions he wrote for controlled substances. The investigation concluded that "Meyers may not have used good judgment in prescribing controlled substances to all of his patients." The Kentucky Board of Medical Licensure recommended that Meyers attend a University of Kentucky miniresidency course in prescribing controlled substances.

On March 18, 1994, this three-member committee of the Board voted to deny Meyers' appointment to active staff. The reasons cited for the committee's decision were Meyers' failure to satisfy requirements that he meet LMH's standard of care, abide by the ethics of the profession, work cooperatively with others, and timely complete medical records. The committee outlined Meyers' pattern of disruptive behavior which included, but was not limited to, temper tantrums, repeated refusal to limit elective cases to time periods routinely reserved for him, attempted interference with the right of an attending physician to refer

a patient to the surgeon of his choice or to transfer the patient, condescending remarks toward women, refusal to speak to a member of his surgical team during surgical procedures, and several instances of throwing a scalpel during surgery. The committee informed Meyers that "[t]his behavior can have an adverse effect on the quality of patient care by inhibiting the ability of hospital personnel to perform optimally, by making it difficult for the hospital to retain qualified personnel, and by interfering with the judgment of referring physicians." The committee further noted that Meyers' behavior "can also disrupt the efficient operation of the hospital and the smooth operation of the surgical department to the detriment of the medical staff, the hospital, and the community." As for his failure to timely complete medical records, the committee stated that "[d]elinquent medical records can put patients at risk by being inaccurate or incomplete if needed to assist in later diagnosis and treatment of a patient." As for quality of care, the committee noted that Meyers had failed to comply with LMH's policy of obtaining post-operative films and that he had demonstrated repeated instances of violating the sterile field.

At this point, the Board began proceedings under the Medical Staff Bylaws Fair Hearing Plan § 2.3-2 which provides that "[a] hearing occasioned by an adverse action of the Trustees pursuant to § 1.2(b) or (c) shall be conducted by a hearing committee appointed by the Chairman of the Trustees and composed of five persons. At least three Medical Staff members shall be included on this committee when feasible." The Fair Hearing Committee was composed of Bill Paxton, a retired court of appeals judge; Fred Greene, an attorney; Mike Robbins, a bank president; Thomas Luckett, an industrialist; and Paul Kerr, a licensed dentist. The Board notified Meyers and explained that it was not feasible to have members of the medical staff on the Fair Hearing Committee. This committee met on eleven occasions. Meyers was represented by counsel, given the opportunity to present witnesses, affidavits, and other

documentary evidence, and given the right to confront, examine, and cross-examine witnesses presented by LMH.

In April 1995, the Fair Hearing Committee issued its report and recommendation that LMH not appoint Meyers to its staff because of his failure to meet LMH's ethical standards and his inability to work cooperatively with others. In May, the Board adopted and affirmed the Fair Hearing Committee's recommendation. The Board informed Meyers of its decision and his right to appeal. Meyers appealed the Board's decision and was again represented by counsel. On August 9, 1995, the Board informed Meyers of its vote to affirm the decision denying clinical privileges to Meyers. This was the Board's final decision and Meyers' privileges were revoked.

## II.  PROCEDURAL HISTORY

On August 22, 1995, Meyers brought suit in Kentucky state court (Logan Circuit Court) seeking a restraining order and a temporary and permanent injunction requiring LMH to reinstate his staff privileges and enjoining LMH from making a report to the National Practitioner Data Bank. The court granted the restraining order and temporary injunction in part but denied the motion for an injunction which would require LMH to reinstate Meyers' privileges.

On August 8, 1996, Meyers filed a second suit in Logan Circuit Court with numerous causes of action against thirty-four defendants. Defendants moved for summary judgment based on immunity pursuant to K.R.S. § 311.377(1). The court denied that motion.

On November 5, 1997, while the two suits were still pending in state court, Meyers filed suit in the United States District Court for the Western District of Kentucky. Following an order for a more definite statement, Meyers filed two amended complaints against twenty-two defendants, including hospital administrators, members of LMH's

medical staff who engaged in investigation and credentialing activities, and members of the Board that took final action after hearing Meyers' appeal. The complaints alleged breach of contract, violations of federal antitrust laws, violations of the Emergency Medical Treatment and Active Labor Act, breach of the covenant of good faith and fair dealing, tortious interference with economic advantage, and defamation. On January 27, 2000, the district court entered an order granting summary judgment in favor of Defendants on the basis of HCQIA immunity. Plaintiffs' motion to alter, amend, and vacate the order was denied on May 25, 2000.

The parties then entered into a stipulation of dismissal, which was entered by the district court on March 23, 2001. In the stipulation, the parties agreed that upon a ruling by the district court on a motion for costs and fees (filed by the defendants on April 6, 2001), the case would be deemed concluded and the ruling on the motion for costs and fees would constitute a final judgment for the purpose of determining the time in which to file appeals.

On August 14, 2001, the district court entered an order denying Defendants' motion for costs and fees. Plaintiffs and Defendants filed timely notices of appeal.

## III.  STANDARDS OF REVIEW

A district court must grant a motion for summary judgment if it finds that the "pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The non-moving party must then produce specific evidence that

demonstrates there is a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. The court must view the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). On appeal, this court reviews an order granting summary judgment *de novo*. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999). The appellate court uses the same legal standard as used by the district court to determine whether summary judgment is appropriate. *Id.*

The district court's denial of Defendants' request for attorney's fees is reviewed for abuse of discretion. *Muzquiz v. W.A. Foote Memorial Hosp., Inc.*, 70 F.3d 422, 432 (6th Cir. 1995).

## IV. DISCUSSION

### A. The district court's grant of summary judgment in favor of Defendants on the basis of HCQIA immunity was proper.

The HCQIA was passed in 1986 to provide for effective peer review and interstate monitoring of incompetent physicians, and to grant qualified immunity from damages for those who participate in peer review activities. *Austin v. McNamara*, 979 F.2d 728, 733 (9th Cir. 1992); 42 U.S.C. § 11101. If a "professional review action",[4] satisfies certain

---

[4] The HCQIA defines "professional review action" as:

an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or

reasonableness requirements, then those persons participating in the review "shall not be liable in damages under any law of the United States or of any State . . . with respect to the action." 42 U.S.C. § 11111(a)(1).

Specifically, persons participating in a professional review action are entitled to immunity if the action is taken:

(1) in the reasonable belief that the action was in furtherance of quality health care;

(2) after a reasonable effort to obtain the facts of the matter;

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances; and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

---

could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician.

42 U.S.C. § 11151(9). "Professional review activity," in turn, is defined as "an activity of a health care entity with respect to an individual physician

(A) to determine whether the physician may have clinical privileges with respect to, or membership in, the entity;
(B) to determine the scope or conditions of such privileges or membership; or
(C) to change or modify such privileges or membership.

*Id.* § 11151(10).

42 U.S.C. § 11112(a). Once the preceding standards are met, the HCQIA offers immunity to:

(A) the professional review body,

(B) any person acting as a member or staff to the body,

(C) any person under a contract or other formal agreement with the body, and

(D) any person who participates with or assists the body with respect to the action.

42 U.S.C. § 11111(a)(1).

The term "professional review body" includes a "health care entity and the governing body or any committee of a health care entity which conducts professional review activity." 42 U.S.C. § 11151(11). The district court correctly found that Defendants all fall within the protected categories listed in § 11111(a)(1). LMH is a health care entity and a professional review body. The individual doctors are covered under (B)-(D) as staff members of LMH, persons under a contract with LMH, or persons who participate with or assist the body with respect to the professional review action.

The HCQIA creates a rebuttable presumption of immunity, forcing the plaintiff to prove that the defendant's actions did not comply with the relevant standards. *Id.* § 11112(a) ("A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence."). As the district court explained, this rebuttable presumption "creates an unusual summary judgment standard" that can be stated as follows: "Might a reasonable jury, viewing the facts in the best light for [the plaintiff], conclude that he has shown, by a preponderance of the evidence, that the defendants' actions

are outside the scope of § 11112(a)?" *Bryan v. James E. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1333 (11th Cir. 1994) (quoting *Austin v. McNamara*, 979 F.2d 728, 734 (9th Cir. 1992)). The plaintiff has the burden of overcoming the presumption of immunity by showing that the review process was not reasonable. *Id.* Meyers argues that Defendants can meet none of the elements for establishing statutory immunity. However, as the district court found, he failed to raise a genuine issue of material fact as to any element. Therefore, we will affirm the grant of summary judgment.

**1.    The Board's Action Was Taken in the Reasonable Belief that It Was in Furtherance of Quality Health Care**

The "reasonable belief" standard of the HCQIA is satisfied if "the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients." *Bryan*, 33 F.3d at 1323 (citing H.R. Rep. No. 903, at 10, *reprinted in* 1986 U.S.C.C.A.N. at 6392-93). It is an objective standard, rather than a subjective good faith requirement. *Id.* (citing *Austin*, 979 F.2d at 734). The Act does not require that the professional review result in actual improvement in the quality of health care, but only that it was undertaken in the reasonable belief that quality health care was being furthered. *Imperial v. Suburban Hosp. Ass'n, Inc.*, 37 F.3d 1026, 1030 (4th Cir. 1994).

Meyers contends that a reasonable jury could find that this element was not satisfied because: (1) eight members of the medical staff testified on behalf of Meyers and no member testified against him; (2) two independent reviewers gave favorable reviews of Meyers; (3) two psychologists who examined Meyers recommended that he receive his privileges; and (4) although some nurses testified as to

disruptive incidents, each of them testified that they could still work with Meyers.

However, the evidence conclusively demonstrates that both the Board's decision and the Fair Hearing Committee's decision were made in the reasonable belief that they were furthering quality health care, and no reasonable jury could find otherwise. Among other evidence, the Fair Hearing Committee heard testimony about twenty-two incident reports involving Meyers which documented loss of temper during surgery, breaking the sterile field, failure to take and document histories before patients were sedated for surgery, and other problems.[5] This evidence was also considered by the Board. The Fair Hearing Committee noted that its decision was based on Meyers' temper tantrums, his use of coercive tactics, delinquent medical records, his inability to work with others, and unethical conduct. As the district court held, these reasons are in furtherance of quality health care, despite the fact that no patients were actually injured. "Quality health care" is not limited to clinical competence, but includes matters of general behavior and ethical conduct. *See Bryan*, 33 F.3d at 1334-35 (finding that the termination of physician's privileges was "taken in reasonable belief that the action was in furtherance of quality health care" where physician had "exhibited a pattern of unprofessional conduct over a period of many years," "was disruptive," and "interfered with the important work of other employees"); *Everhart v. Jefferson Parish Hosp. Dist. No. 2.,* 757 F.2d 1567, 1573 (5th Cir. 1985) ("[Q]uality patient care demands

---

[5]Meyers argues that genuine issues of fact exist regarding the veracity of the underlying allegations against him. Our review, however, is not directed at whether each of the complaints were undisputedly true, but whether Defendants acted reasonably in considering and relying upon them. In this case, in view of the volume of incidents and the seriousness of the complaints, there is no genuine issue with respect to the reasonableness of Defendants' belief that their action was taken in the furtherance of quality health care.

that doctors possess at least a reasonable 'ability to work with others.'"). Meyers failed to present evidence that the action against him was not taken in the reasonable belief that it furthered quality health care.

### 2. The Board's Action Was Taken After a Reasonable Effort to Obtain the Facts of the Matter

Similarly, Meyers failed to raise any genuine issue of fact with respect to the second element of HCQIA immunity. The inquiry is whether the "totality of the process" leading up to the professional review action evinced a reasonable effort to obtain the facts of the matter. *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 637 (3d Cir. 1996). In this case, there was an exhaustive review process. As the district court noted, Meyers was reviewed by both the Credentials Committee and the MEC, as well as by a committee of three Board members who conducted an independent investigation. This three-person committee questioned Meyers and gave him an opportunity to provide them with additional information. It then made a recommendation to the Board, which voted to deny Meyers' appointment to the active staff. Thereafter, the Fair Hearing Committee met on eleven occasions and heard testimony from thirty-five witnesses. Meyers was represented by counsel, given the opportunity to present witnesses, affidavits, and other documentary evidence, and given the right to confront, examine, and cross-examine witnesses presented by LMH. Meyers disputes that a "reasonable inquiry" occurred, but his argument is limited to conclusory statements attacking individual items of evidence considered by the reviewers. He fails, however, to raise a genuine issue to rebut the presumption that the professional review action was taken after a "reasonable effort to obtain the facts."

### 3. Meyers Received Adequate Notice and Hearing Procedures

The third element of the HCQIA immunity test is whether adequate notice and hearing procedures were afforded to the physician involved. 42 U.S.C. § 11112(a)(3). Meyers raises the same argument on appeal that he presented to the district court. He argues that a reasonable jury could conclude that LMH did not provide adequate notice and procedures because it did not comply with its own bylaws.

This argument fails for two reasons. First, Meyers failed to show that LMH violated its bylaws. Second, even assuming LMH did violate the bylaws, the notice and procedures provided complied with the HCQIA's statutory "safe harbor," as described below.

First, the Board was proceeding under the Medical Staff Bylaws Fair Hearing Plan § 2.3-2 which provides that "[a] hearing occasioned by an adverse action of the Trustees pursuant to § 1.2(b) or (c) shall be conducted by a hearing committee appointed by the Chairman of the Trustees and composed of five persons. At least three Medical Staff members shall be included on this committee *when feasible*." (Emphasis added.) Claudia Dickerson, counsel for LMH, explained in letters to Meyers' counsel dated June 27 and July 1, 1994, that it was not feasible to appoint members of the medical staff to the Fair Hearing Committee because some were working too many hours to devote adequate time to the Committee, some had been involved previously in Meyers' peer review or incidents under review, and some were, themselves, possible subjects of future peer review. Meyers disputes this fact by saying that he located four members of the medical staff who had not been asked to serve on the Committee. However, this evidence alone cannot show that LMH violated its bylaws.

In any event, the HCQIA sets out specific "safe harbor" procedures, which satisfy the "notice and hearing procedures" requirement of § 11112(a)(3). This requirement is met if the hospital has provided, or the physician has voluntarily waived, the following:

1. The physician has been given notice stating that a professional review action has been proposed to be taken against the physician, reasons for the proposed action, that the physician has the right to request a hearing on the proposed action, any time limit (of not less than 30 days) within which to request such a hearing, and a summary of the rights in the hearing . . . .

2. If a hearing is requested on a timely basis . . . , the physician involved must be given notice stating the place, time, and date, of the hearing, which date shall not be less than 30 days after the date of the notice, and a list of the witnesses (if any) expected to testify at the hearing on behalf of the professional review body.

3. If a hearing is requested on a timely basis . . . , the hearing shall be held (as determined by the health care entity) before an arbitrator mutually acceptable to the physician and the health care entity, before a hearing officer who is appointed by the entity and who is not in direct economic competition with the physician involved, or before a panel of individuals who are appointed by the entity and are not in direct economic competition with the physician involved.

4. [I]n the hearing the physician involved has the right to representation by an attorney or other person of the physician's choice, to have a record made of the proceedings, copies of which may be obtained by the physician upon payment of any reasonable

charges associated with the preparation thereof, to call, examine, and cross-examine witnesses, to present evidence determined to be relevant by the hearing officer, regardless of its admissibility in a court of law, and to submit a written statement at the close of the hearing; and upon completion of the hearing, the physician involved has the right to receive the written recommendation of the arbitrator, officer, or panel, including a statement of the basis for the recommendations, and to receive a written decision of the health care entity, including a statement of the basis for the decision.

42 U.S.C. § 11112(b).[6]   The district court correctly found that no reasonable jury could find that Meyers did not receive adequate notice or the other requirements of § 11112(b) were not met. Meyers himself admitted under oath that he received each of the HCQIA's notice and hearing requirements (which had been outlined in a letter to him). Accordingly, his argument that notice was insufficient fails.

### 4. The Board's Action Was Taken in the Reasonable Belief That the Action Was Warranted by the Facts

The district court also held that no reasonable jury could find that the Board did not take the action in the reasonable belief that it was warranted by the facts. "Our analysis under § 11112(a)(4) closely tracks our analysis under § 11112(a)(1)." *Gabaldoni v. Washington County Hosp. Ass'n*, 250 F.3d 255, 263 n.7 (4th Cir. 2001) (quoting *Sugarbaker v. SSM Health Care,* 190 F.3d 905, 916 (8th Cir. 1999)); *Brader v. Allegheny Gen. Hosp.*, 167 F.3d 832, 843

---

[6]We also note that § 11112(b) also provides that a failure to meet the "safe harbor" provisions outlined above does "not, in itself, constitute failure to meet the [adequate notice and hearing] standards of subsection (a)(3) of this section." 42 U.S.C. § 11112(b).

(3d Cir. 1999). While Meyers challenges certain of the underlying facts upon which Defendants relied, he has not shown that the facts were "so obviously mistaken or inadequate as to make reliance on them unreasonable." *Mathews,* 87 F.3d at 638. Moreover, "a plaintiff's showing 'that [the] doctors reached an incorrect conclusion on a particular medical issue because of a lack of understanding' does not 'meet the burden of contradicting the existence of a reasonable belief that they were furthering health care quality in participating in the peer review process.'" *Brader,* 167 F.3d at 843 (quoting *Imperial,* 37 F.3d at 1030).[7] In view of the Board's well-supported findings that Meyers had failed to meet LMH's ethical standards and that he was unable to work cooperatively with others, there is no genuine issue as to whether the Board's action was taken in the reasonable belief that it was warranted by the facts.

### 5. Meyers' Legislative History Argument

Meyers makes one additional argument, contending that "the District Court erred in granting immunity under the Act where the review was conducted entirely by nonmedical personnel because such does not constitute 'peer review.'" Appellants' Brief at 31.) Although "peer review" is not defined in the Act, it has been described as "the process by which physicians and hospitals evaluate and discipline staff doctors." *Bryan*, 33 F.3d at 1321. *Bryan* explained peer review as the entire system of handling physician disciplinary actions, from promulgation of bylaws to medical staff recommendation to final Board action. *Id.* at 1324. Accordingly, the process at issue was "peer review."

Meyers also claims that "the Act does not give immunity to persons, other than physicians and medical personnel, performing peer reviews of physicians." Appellants' Brief at

---

[7]*See also supra* note 5.

32.) As Defendants point out, the point is moot because none of the non-physician reviewers is a defendant in this action. (Appellees' Brief at 55.)  Even so, Meyers devotes twenty-five pages of his appellate brief to this argument, including extensive discussion of legislative history that he argues indicates the purpose of the Act is to provide immunity for *physicians* participating in peer review, and not for others involved in the review process.  He argues that

> the disputed section of the Act states that "(A) the professional review body, (B) any *person* acting as a member or staff to the body, (C) any *person* under a contract or other formal agreement with the body, and (D) any *person* who participates with or assists the body with respect to the action, shall not be liable in damages . . . ."  42 U.S.C. § 11111(a)(1)(A)-(D) . . . The Act is ambiguous in defining to whom it grants immunity.  The word "person" in the Act is never defined, even though the Act defines many other words used.

(*Id.* at 34-35.)  Meyers thus implies that, because the review was not conducted by physicians, the review was not a "professional review action" and thus the HCQIA does not apply.

We disagree and find that the statutory language is not ambiguous as to who is entitled to immunity or as to what actions are covered.  It is clear that every "person" who participates in a professional review action is entitled to immunity.  42 U.S.C. § 11111(a)(1).  Meyers argues that the word "person" should be read as "physician," but there is no support for this assertion.  Where the language of the statute is not ambiguous, it is unnecessary to resort to legislative history.  *See, e.g., Garcia v. United States*, 469 U.S. 70, 76 n.3.  In any event, Meyers' legislative history discussion is limited to statements made about the general purpose of the Act, rather than the specific provision at issue.  Accordingly, his argument fails.  Had Congress wished to specify that

immunity was only intended for physicians, it could have done so.  In its order granting Defendants' summary judgment motion, the district court stated that it could

> find no provision of the HCQIA which requires the professional review process to be conducted by physicians only.  In fact, the language of the HCQIA uses the word "person" rather than "physician" to describe those who will be granted immunity.  42 U.S.C. §§ 11111(a)(1)(B)-(D).  Furthermore, under the HCQIA, a hearing may be conducted by an arbitrator, hearing officer, or panel of *individuals*, which contemplates the use of non-physicians in the professional review process.  *Id.* § 11112(b)(3)(A)(I)-(iii).

(J.A. at 11 (emphasis added).)  The district court's reasoning was correct, and we hold that the action in this case was a professional review action giving rise to HCQIA immunity for the persons involved.

**B.    Cross-Appeal: The District Court Did Not Abuse Its Discretion in Declining to Award Attorney's Fees**

Finally, Defendants contend that the district court erred in denying their motion for costs and attorney's fees.  The following provision of the HCQIA provides for fee-shifting:

> In any suit brought against a defendant, to the extent that a defendant has met the standards set forth under section 11112(a) of this title and the defendant substantially prevails, the court shall, at the conclusion of the action, award to a substantially prevailing party defending against any such claim the cost of the suit attributable to such claim, including a reasonable attorney's fee, if the claim, or the claimant's conduct during the litigation of the claim, was frivolous, unreasonable, without foundation, or in bad faith.

42 U.S.C. § 11113. Thus, a defendant should receive an award of costs and fees when (1) the defendants are among the persons covered by the HCQIA, (2) the standards set forth in § 11112(a) were followed, (3) the defendants substantially prevailed, and (4) the plaintiffs' claim or conduct during the litigation was frivolous, unreasonable, without foundation, or in bad faith. Defendants in this case clearly satisfied the first three factors. Whether a party's claim or conduct is frivolous, unreasonable, or without foundation is a question committed to the sound discretion of the district court. *Johnson v. Nyack Hosp.*, 964 F.2d 116, 123 (2d Cir. 1992) (citing *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978)).

Examining the facts, the district court found that the fourth factor was not satisfied because plaintiffs' claims and conduct were not frivolous, unreasonable, without foundation, or in bad faith. In its order denying Defendants' motion for costs and fees, the court stated that:

> it was not unreasonable, frivolous, without foundation, or in bad faith for plaintiffs to oppose the LMH Defendants' position on HCQIA immunity. Plaintiffs had valid questions concerning the manner in which the LMH Defendants conducted the professional review of Dr. Robert Meyers and chose to resolve those issues in this Court. As stated above, the fact that Plaintiff did not prevail in no way indicates that Plaintiffs' claims were unreasonable, frivolous, without foundation, or in bad faith.

(J.A. at 265.) Furthermore, because the HCQIA immunity issue decided the case, the district court never determined whether plaintiffs had sufficient evidence to reach a jury on their claims related to antitrust, COBRA, EMTALA, breach of covenant of good faith and fair dealing, or defamation. As such, the district court could not say that those claims lacked foundation.

Defendants/cross-appellants contend that the district court erred by considering only the foundation of Meyers' *claims* without considering his "abusive" *conduct*. They seek $2,349 in costs and $215,031 in attorney's fees. Specifically, cross-appellants argue that Meyers' filing suit in federal court while his two state court suits were pending was a "relentless pursuit" that "was a continuation of harassing behavior demonstrated at [LMH] and other hospitals." (Appellees' Brief at 68.) Meyers' behavior at other hospitals is not a proper consideration in the attorney's fees question. The fact that he filed two actions in state court before filing the action in federal court is relevant, but not determinative of the attorney's fees issue. As Meyers points out, there is "*no* evidence whatever on the litigation strategy question as to why the federal action was pursued instead of the state action." (Appellants' Reply Brief at 53.) The district court was very familiar with plaintiffs' claims and conduct, having presided over the case for nearly four years. It correctly stated and applied the standard for granting attorney's fees.

Even if we may have decided the attorney's fees issue differently if reviewing *de novo*, Defendants fail to demonstrate that the district court abused its discretion by denying attorney's fees in this case.

## V. CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment and its denial of costs and fees.