Lawrence R. KOVAL, Plaintiff–
Appellant,

v.

DOW JONES & CO.; Brad Augenstein,
William Casey, and Michael Marvaso,
in their Individual and Official Capac-
ities, Defendants–Appellees.

No. 02–3620.

United States Court of Appeals,
Sixth Circuit.

Jan. 6, 2004.

Edward G. Kramer, David G. Oakley, Kramer & Associates, Cleveland, OH, for Plaintiff–Appellant.

Lee J. Hutton, Michael T. Pearson, Duvin, Cahn & Hutton, Cleveland, OH, for Defendants–Appellees.

Before SILER, DAUGHTREY, and GIBBONS, Circuit Judges.

GIBBONS, Circuit Judge.

Plaintiff-appellant Lawrence Koval, a white male, worked at defendant-appellee Dow Jones & Co. ("Dow Jones") for twen-ty-one years, beginning in 1978. In 1994, Koval sought promotion to a position created after a restructuring of the company, but a younger minority female obtained the post. The company underwent restructuring again in 1999, after which Dow Jones released Koval from employment. Koval subsequently filed suit against Dow Jones and several of its executives in Ohio state court alleging that, by refusing to promote Koval and by ultimately terminating his employment, defendants engaged in age and race discrimination in violation of Ohio state law and wrongfully discharged him in violation of Ohio common law. Koval also presented a promissory estoppel claim, arguing that he detrimentally relied on representations made by defendants concerning his employment. Defendants filed a motion for summary judgment on all of Koval's claims, which was granted by the district court. For the following reasons, we affirm the judgment of the district court.

## I.

Dow Jones & Co. is a newspaper and information services company with more than 8,000 employees. The publication for which it is most well known is the *Wall Street Journal.*

Koval, a resident of Ohio, began working for Dow Jones in 1978 as a part-time lead carrier, which involved delivering the *Wall Street Journal* in and around Cleveland, Ohio. In 1979, Dow Jones transferred Koval to its National Distribution Service ("NDS"), a subsidiary of Dow Jones dedicated to managing the morning delivery of the *Wall Street Journal.* NDS was separate from Dow Jones's Circulation Services Department ("CSD"), which was responsible for mail deliveries and single copy sales of the *Wall Street Journal* at newsstands. Koval initially worked as a field operations manager in NDS and re-

ported to defendant-appellee Michael Marvaso. As field operations manager. Koval was responsible for managing morning delivery operations that were supplied by a particular printing plant. In 1980. Koval was promoted within NDS to the position of regional operations manager for Dow Jones's Midwest region, which involved overseeing morning delivery operations for that entire region.

Koval continued as regional operations manager in NDS until 1991, when NDS forfeited its subsidiary status and merged into Dow Jones. As a result of the merger, NDS's operations were assumed by Dow Jones's CSD. After the merger, Koval became one of six senior circulation mangers in CSD. Though he was the senior circulation manager for only the eastern portion of Dow Jones's Midwest region, a geographical unit smaller than that for which he was the regional operations manager prior to the merger, his responsibilities increased. These responsibilities included managing the delivery of the *Wall Street Journal* through the mails in addition to managing morning delivery services. Koval also became responsible for managing the staff within the Dow Jones printing plants in his sector of the Midwest and for overseeing the transportation system that distributed newspapers to post offices, wholesalers, carriers, and newsstands in that sector.

In 1994, CSD was reorganized and renamed Circulation Field Operations ("CFO"). As a result of this reorganization. CFO assumed responsibility for educational sales and marketing in addition to the delivery and distribution operations formerly controlled by CSD. In other words, while CSD has been concerned primarily with delivery and distribution, CFO would involve both delivery and sales oper-

ations. CFO was divided into five geographic regions, which were further subdivided into sixteen markets. Each region was controlled by a Regional Circulation Executive ("RCE"), while each market was managed by a Circulation Market Manager ("CMM"). Koval wanted to be appointed RCE for the entire Midwest region, but Dow Jones promoted Regina Howard–Glaspie—who had been senior circulation manager for the western portion of Dow Jones's Midwest region prior to reorganization—to that position. Howard–Glaspie is an African–American female who is younger than Koval. Rather than obtaining the RCE position, Koval became the CMM for CFO's Cleveland–Pittsburgh–Buffalo market, which—in addition to managing delivery operations—entailed managing sales representatives who attempted to increase the sales of Dow Jones services and publications to educational institutions in the market.

In 1998, Dow Jones underwent another round of reorganization.[1] To streamline operations, Dow Jones consolidated eight of the CFO markets into four markets. In each of these consolidated markets, only one CMM was needed, which resulted in the elimination of four CMM positions. Coupled with consolidation, Dow Jones also divested CMMs of their sales responsibilities. A new CMM/Sales position was created in each region to manage all sales operations within each region's sub-component markets.

As a result of the reorganization. CFO's Cleveland–Pittsburgh–Buffalo market—the market for which Koval was CMM—combined with its Michigan–Ohio market. Only one CMM was required for the consolidated market. In 1999, Dow Jones named the CMM of the Michigan–

---

1. It is undisputed that CFO was initially divided into five regions. However, the parties agree that by 1998 CFO had been restructured to consist of only four regions.

Ohio market—Robert Jackson, an African-American male younger than Koval—rather than Koval as the CMM for the newly consolidated Michigan–Ohio–Cleveland–Pittsburgh–Buffalo market. Dow Jones did not assign Koval to another position and released him from employment in 1999. At the time, Koval was 46 years old.

On September 3, 1999, Koval filed suit against Dow Jones and several Dow Jones executives[2] in the Court of Common Pleas of Cuyahoga County, Ohio. Koval alleged that, in promoting Howard–Glaspie to RCE in 1994 instead of him and in retaining Jackson for the CMM position in 1999 instead of him, defendants violated Ohio Rev.Code §§ 4112.14 & .99, which prohibit employers from discriminating on the basis of, *inter alia*, race and age.[3] Koval also alleged that his discharge by Dow Jones constitutes a wrongful discharge against public policy in violation of Ohio common law, and he further asserted a claim for promissory estoppel on the basis that defendants made representations to him, upon which he detrimentally relied, concerning his job security. As redress for these alleged violations of law, Koval seeks $500,000 in compensatory damages and $1,000,000 in punitive damages, in addition to certain declaratory and injunctive relief. On October 7, 1999, defendants removed Koval's suit to the United States District Court for the Northern District of Ohio pursuant to 28 U.S.C. § 1441 on the basis of diversity jurisdiction.[4]

Defendants filed a motion for summary judgment on November 13, 2000. The court referred the motion to a magistrate judge for report and recommendation. In a report submitted on July 13, 2001, the magistrate determined that Koval did not provide any direct evidence of either age or race discrimination. The magistrate also found that Koval did not provide sufficient evidence to support a *prima facie* case of race discrimination under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and that, even if Koval could present such a case, he did not provide evidence permitting an inference that the legitimate, non-discriminatory reason offered by defendants for their actions is pretextual. The magistrate then found that, though Koval did not present evidence in support of a *prima facie* case of age discrimination with respect to his termination in 1999, he did present such evidence with respect to defendants' failure to promote him in 1994. Nonetheless, the magistrate determined that Koval's failure to provide evidence that defendants' justification for refusing to promote him is pretextual precluded Koval from succeeding on this age discrimination claim. Finally, the magistrate determined that Koval failed to provide evidence sufficient to support either his

2. These executives are: Brad Augenstein, Regional Circulation Executive; William Casey, Vice President for Circulation; and Michael Marvaso, Director of Circulation Field Operations.

3. Koval presented both of his age discrimination claims under Ohio Rev.Code § 4112.14, which provides for a six-year statute of limitations. *See Ziegler v. IBP Hog Mkt., Inc.* 249 F.3d 509, 518 (6th Cir.2001). Hence, Koval's 1994 age discrimination claim is not time-barred. Koval presented both of his race discrimination claims under Ohio Rev.Code § 4112.99, which also provides for a six-year statute of limitations. *See Cosgrove v. Williamsburg of Cincinnati Mgmt. Co.*, 70 Ohio St.3d 281, 638 N.E.2d 991, 998–99 (1994); *see also Harrison v. City of Akron*, 43 Fed.Appx. 903, 905, 2002 WL 1832741 (6th Cir.2002). Therefore, Koval's 1994 race discrimination claim is also not time-barred.

4. At the time, Augenstein was a resident of Illinois, and Casey and Marvaso were residents of New Jersey. Dow Jones was incorporated in Delaware and operates principally in New York and New Jersey.

wrongful discharge claim or his promissory estoppel claim. Consequently, the magistrate recommended that the district court grant defendants' motion for summary judgment. The district court adopted this recommendation on April 30, 2002, and granted summary judgment for defendants.[5] Koval filed a timely appeal on May 29, 2002.

## II.

A district court's grant of summary judgment is reviewed *de novo*. *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 361 (6th Cir.2001). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party requesting summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Meyers v. Columbia/HCA Healthcare Corp.*, 341 F.3d 461, 466 (6th Cir.2003). If the moving party makes this showing, the burden shifts to the non-moving party to demonstrate the presence of a genuine issue of material fact requiring trial. *Id.* The non-moving party must present "more than a mere scintilla of evidence" of a factual dispute to meet this burden. *Little*, 265 F.3d at 361. However, when reviewing a motion for summary judgment, the court views all the evidence in the light most favorable to the non-moving party. *Ngu-*

*yen v. City of Cleveland*, 229 F.3d 559, 562 (6th Cir.2000). Ultimately, the Court must decide "whether the evidence presents sufficient disagreement to require submission to a jury or whether [the evidence] is so one-sided that one party must prevail as a matter of law." *Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 178 (6th Cir.1996) (internal quotation marks omitted).

### A. Discrimination Claims

Under Ohio law, it is unlawful for an employer to discriminate against an employee on the basis of either race or age. *See* Ohio Rev.Code §§ 4112.02(A) & .14. Ohio courts evaluate discrimination claims presented under § 4112 according to the same standards federal courts utilize to evaluate discrimination claims presented under Title VII of the Civil Rights Act of 1964, 42 U.S.C.2000e–2000e(17). *Ohio Civil Rights Comm'n v. David Richard Ingram, D.C., Inc.*, 69 Ohio St.3d 89, 630 N.E.2d 669, 672 (1994); *see also Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992). However, Ohio courts recognize that § 4112, unlike Title VII, provides that a manager may be jointly and/or severally liable with the employer for discriminatory actions taken by the manager against another of the employer's employees. *Genaro v. Cent. Transp., Inc.*, 84 Ohio St.3d 293, 703 N.E.2d 782, 784–85 (1999), which is the basis on which Koval asserts his claims against the Dow Jones executives named in this suit.

---

**5.** The only portion of the magistrate's report and recommendation that the district court did not adopt was the determination that Koval had not produced evidence to demonstrate that he was treated differently from similarly-situated minority employees. The court refused to do so because it found that defendants did not seek summary judgment on this ground. The only other caveat mentioned by

the court was that, though it agreed with the magistrate that Koval could not demonstrate pretext, in reaching this conclusion the magistrate erroneously applied a pretext-plus standard to Koval's claims by essentially requiring him to provide evidence of discrimination beyond a *prima facie* case and in addition to evidence of pretext in order to survive summary judgment.

To succeed on a discrimination claim based on indirect evidence,[6] a plaintiff must first demonstrate a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668. 802 (1973); *see also Carter v. Univ. of Toledo,* 349 F.3d 269, 272–73 (6th Cir.2003). If a plaintiff demonstrates a *prima facie* case of either age or race discrimination, the burden shifts to the defendant to produce a legitimate, non-discriminatory reason for the challenged employment actions. *McDonnell Douglas,* 411 U.S. at 802; *see also Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 574 (6th Cir.2003) (en banc) (applying *McDonnell Douglas* analysis to age discrimination claim); *Zambetti v. Cuyahoga Cmty. Coll.,* 314 F.3d 249, 255–56 (6th Cir.2002) (applying *McDonnell Douglas* analysis to reverse race discrimination claim). The defendant need only produce a legitimate, non-discriminatory reason; it need not persuade the court that this reason actually motivated the employment actions in question. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142–43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Once the defendant meets its burden of producing a legitimate, non-discriminatory reason for its challenged actions, the burden shifts to the plaintiff to demonstrate that the asserted justification is mere pretext for discriminatory motives. *Sutherland v. Mich. Dep't of Treasury,* 344 F.3d 603, 615 (6th Cir.2003). The plaintiff may meet this burden by showing that the reason offered by the defendant for the challenged employment actions (1) has no basis in fact. (2) did not actually motivate the actions, or (3) was insufficient to warrant the actions. *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1084 (6th

Cir.1994). The burden of persuading the trier of fact that defendant's asserted justification is pretextual ultimately rests with the plaintiff. *Anthony v. BTR Auto. Sealing Sys., Inc.,* 339 F.3d 506, 515 (6th Cir. 2003).

Koval asserts that the district court erred in finding that he did not present a *prima facie* case on either of his race discrimination claims and that he did not present a *prima facie* case on his age discrimination claim relating to his discharge in 1999. Koval also argues that the district court erred in finding that Koval could not demonstrate pretext with respect to any of his claims. Assuming without deciding that Koval could present a *prima facie* case on each of his discrimination claims, summary judgment for defendants is nonetheless appropriate because Koval does not present evidence sufficient to permit a finding that the reasons offered by defendants for the employment actions in question are pretextual.

### 1. Promotion

■ Defendants assert that Koval was not promoted to RCE in 1994 because, as evidenced by performance evaluations beginning in 1989 and continuing through 1992, he exhibited a territorial approach to leadership, did not work well with other departments, frequently possessed a negative attitude, and was often inflexible. For instance, in 1989, Marvaso drafted a memo recounting a conversation he had with Koval. In the memo, Marvaso notes that Koval's "attitude is increasingly negative" and that "his effectiveness at team building across [departmental] lines does not appear to be strong." Marvaso related that Koval's attitude was that his depart-

---

**6.** Koval does not challenge the district court's finding that he presented no direct evidence of discrimination. Hence, the only discrimination claims before this court are based on indirect evidence. *See Marks v. Newcourt Credit Group, Inc.,* 342 F.3d 444, 462 (6th Cir.2003).

ment "is always right and the rest of the country is wrong" and that Koval believed "no one in the company knows what they are talking about." Koval recalls having this discussion with Marvaso and does not dispute Marvaso's characterization of it.

A 1991 performance evaluation states that Koval "continues to be perceived, by some, as a difficult manager to interact with. This is not the pervasive opinion of [Koval]. However, [Koval] must be cognizant that some have this perception and work to overcome it." In 1992, Marvaso provided the following evaluation of Koval:

> [Koval] continues to exhibit territorial traits that may interfere with his decision making.... [He] exhibits a need to be in control and in a position of authority in order to be effective, and has expressed to me, and to others, this need to "dictate the agenda". Because the Circulation Department needs to work across departmental lines to achieve goals and build consensus this style and approach run counter to objectives.... [Koval] must not only alter his leadership style and adopt a new attitude but instill new [sic] approach within the managers who report to him.

In 1993, Marvaso noted in a performance evaluation that Koval exhibited "less of the territorial approach to management in this year" but also noted that Koval had to continue working to improve the perception of him and his department.

Defendants assert that Koval's difficulty working with others is also evidenced by his confrontation with another employee prior to 1994. In 1991, National Circulation Director Mike Sheehan sent Donna Bellucci, an accounting assistant, to each region to help senior circulation managers conform budgets to Dow Jones's national standards. Koval testified that he recalls Bellucci's visit to his department. Koval recounted that he and Bellucci disagreed on how he should manage his budget. Koval's recollection of his interaction with Bellucci demonstrates that it was confrontational: "I certainly wasn't going to have somebody come in that really wasn't even familiar with my area or operation and start taking over what was my job. She was way out of line. And you know. I basically told her I didn't need her and she could go elsewhere. And she took it personally and she left...." Marvaso testified that he received similar reports of the incident, that his understanding was that Koval "took strong objection to the fact that [Bellucci] was doing what she was doing," and that Koval "pull[ed] rank and essentially [told] her to leave, he didn't need her."

■ Defendants contend that the cumulative impression generated by these reports—that Koval was combative, territorial, and a difficult person with whom to work—justified its decision not to promote Koval in 1994. Koval asserts that this justification has no basis in fact. On the contrary, prior to the 1994 reorganization, Dow Jones management consistently received negative reports concerning Koval's managerial style and his ability to facilitate harmonious interaction between company departments. Marvaso, Koval's superior, himself chronicled shortcomings of Koval that he observed. Koval contends that, insofar as Marvaso's or Dow Jones's evaluations of him were premised on complaints of others, such complaints are unsubstantiated and cannot serve as the basis for defendants' decision not to promote him. An employer need not prove that complaints or perceptions about an employee are true before using such complaints as a basis for action. As long as an employer honestly believes complaints about an employee are true, such complaints can serve as a justification for an employment action and will not be regarded as pretextual.

*See Braithwaite v. Timken Co.*, 258 F.3d 488, 493–94 (6th Cir.2001). An honest belief is a belief established by reasonable reliance on particularized facts known to the employer prior to the adverse employment decision. *Id.* at 494. Defendants' beliefs in complaints about Koval's attitude and leadership abilities were honestly held because such complaints are corroborated by particularized facts known to defendants prior to deciding not to promote Koval. Specifically, complaints about Koval's attitude are corroborated by Marvaso's own evaluations of Koval's performance prior to the 1994 reorganization. Such complaints are also corroborated by the undisputed incident involving Koval and Bellucci, which occurred before the 1994 reorganization.

Koval also argues that the district court erred by focusing solely on the negative aspects of his performance evaluations and should have considered positive statements included in these evaluations when determining whether defendants' justification is pretextual. Koval does not dispute that certain aspects of his evaluations were negative. Rather, his argument is essentially that his job performance did not actually motivate the decision not to promote him because his performance was generally positive.

> As the Seventh Circuit has noted,
> [t]he fact that an employee does some things well does not mean that any reason given for his firing is a pretext for discrimination.... Unless he attacks the specific reasons given for a termination, a plaintiff who stresses evidence of satisfactory performance is simply challenging the wisdom of the employer's decision, which we have consistently refused to review.

*Anderson v. Stauffer Chem. Co.*, 965 F.2d 397, 403 (7th Cir.1992) (citations omitted). In this case, defendants cite Koval's territorial leadership and poor attitude as justification for not promoting him to a position that required strong leadership and teamwork abilities. As Marvaso testified, in filling the RCE position, the "[p]rimary issue was the issue of leadership, the ability to bring together groups of people who had heretofore worked in separate organizations, to work in concert towards single purposes." Koval's assertion that, aside from questions about his leadership abilities, he otherwise performed well in his position does not refute defendants' justification or demonstrate that it did not motivate their decision. Quite the contrary, it is reasonable to deduce that Koval's performance did motivate the decision not to promote him because his performance was deficient precisely in the areas most important to the position in question.

In support of his motivation argument, Koval cites *Logan v. Denny's, Inc.*, 259 F.3d 558 (6th Cir.2001), for the proposition that, when a defendant claims an employee's poor performance was the justification for an adverse employment action against that employee, a court must consider that employee's positive comments in performance evaluations in addition to negative comments in those evaluations to determine whether the justification is pretextual. While it is true that the court in *Logan* criticized a defendant's selective sampling of an employee's performance evaluations, the court was primarily concerned by the fact that the defendant completely distorted plaintiff's performance record over time. *Id.* at 576–77 ("We find Defendant's mischaracterization of the record, which serves no useful purpose and simply misleads the court, to be unconscionable."). For example, the defendants in that case characterized certain performance evaluations as negative when the evaluations were in fact positive. *Id.* at 576. In this case, defendants do not completely mis-

characterize Koval's performance record and do not dispute that Koval received positive evaluations on certain criteria. Rather, they focus on the most relevant characteristics for the position in question. Defendants rationally highlight that Koval's leadership abilities—abilities crucial to the RCE position—were evaluated as being less than stellar. It was not error for the district court to pay particular attention to such evaluations considering their importance to the position in question. Furthermore, while the district court did not expressly reference positive components of Koval's evaluations, the magistrate did so in its report and recommendation. Because the district court adopted this report and recommendation, the district court did not ignore such evaluations either.[7] Koval provides no other evidence that Dow Jones's decision not to promote him was not motivated by the asserted justifications.

Finally, Koval does not contend that the asserted justification was insufficient to warrant the decision not to promote him to RCE. Even if he were to make such an argument, it would fail. Generally, a plaintiff may demonstrate that an asserted justification was insufficient to motivate a particular employment decision by showing that other employees who engaged in substantially identical conduct to that of plaintiff did not suffer the same fate as the plaintiff. *See Manzer*, 29 F.3d at 1084. Koval provides no such evidence. More-

over, it is clear that leadership abilities were crucial to the RCE position. Doubts about Koval's leadership abilities and ability to interact with others would certainly warrant not appointing Koval to a position that required such qualities.

In conclusion, Koval does not provide sufficient evidence to permit a finding that the reasons offered by defendants for the decision not to promote him to RCE were mere pretext for discriminatory motives.

### 2. Discharge

■ As for the decision not to retain Koval as CMM in 1999, defendants cite the same justification offered for the decision not to promote him in 1994—concisely, that Koval was territorial and did not work well with people in other departments. Defendants, however, note that several additional actions by Koval after 1994 further support the assertion that this justification was the basis for the decision not to retain him in 1999. First, defendants point to a program developed by Koval in 1997 in conjunction with the University of Pittsburgh's Katz School of Business. Under this program, Koval arranged for Dow Jones to provide the school with access to Dow Jones's news retrieval services in exchange for a guarantee from the school that it would arrange for 500 subscriptions to the *Wall Street Journal* and would participate in other promotional arrangements.[8] Defendants assert that this pro-

---

7. *Logan* is also distinguishable from the instant case in that the plaintiff in *Logan* consistently received positive evaluations until a mere two months before she was constructively discharged, which suggested that the negative evaluations were fabricated to serve as pretext. *Id.* at 575. The evidence in the case *sub judice* demonstrates that Koval's attitude and leadership abilities were criticized at least as early as 1989, a full six years before Koval was passed over for a promotion to RCE.

8. A dispute exists as to whether the news services were provided at no cost other than the 500 subscriptions or whether the business school was charged a fixed rate for such services in addition to the subscriptions. Marvaso testified that the news retrieval services were given to the business school at no cost. Koval testified that the services were provided at a fixed cost of $6,000. Regardless of the exact nature of the arrangement, it is uncontested that the program was criti-

gram was costly to Dow Jones. Koval testified that the program was "nitpicked and criticized to death." Koval also admitted to resenting such criticisms. According to defendants. Koval's resistance to criticism of this localized arrangement demonstrates that Koval continued to be territorial.

A second factor offered by defendants in support of its discharge justification concerns an arrangement between Dow Jones and the Toronto Globe & Mail. In 1995, Koval developed a network of wholesale newspaper distributors to increase circulation of the *Wall Street Journal* in Toronto. In 1998 Dow Jones entered a more advantageous exclusive delivery arrangement with the Toronto Globe & Mail that supplanted Koval's network and improved delivery not just in Toronto but also across Canada. Marvaso testified that Koval resisted this change and defendants assert that this resistance demonstrates that Koval continued to exhibit territorial traits

well past 1994. Koval admitted to criticizing the change.

The final post–1994 evidence supporting the discharge justification is that, from 1994 to 1998. Koval fought against the elimination of the Pittsburgh office, which was under his control as CMM. even though the elimination would reduce costs.[9] Defendants assert that this attitude further demonstrates that Koval continued to exhibit territorial managerial behavior after 1994.

Koval does not dispute that these aforementioned events occurred.[10] Hence, he does not contest the factual bases for the 1999 discharge justification. Rather, Koval argues that the 1999 discharge justification is pretextual because, as evidenced by the fact that he received positive evaluations in 1995 and 1996 complementing him on his teamwork abilities, the justification did not actually motivate the decision to discharge him. According to Koval, these positive evaluations suggest that he

---

cized by management and that Koval resented this criticism.

9. Defendants actually also suggest that Koval's territorialism is evidenced by his failure to reduce costs in his market in favor of protecting his own staff and operation. There is at least some factual dispute as to the reason costs were high in Koval's market. Koval asserts that the high costs were the result of directives imposed on him by management. Marvaso ascribed the high costs to decisions made by Koval. Even if Koval has created a fact issue as to whether he was the cause for high costs in his market, the existence of this fact issue would not be a basis for denying summary judgment. There is no evidence that defendants did not honestly believe that Koval was responsible for high costs. Moreover, defendants' justification is supported by other evidence, which Koval has not refuted.

10. Koval does attempt to justify his objections to the Toronto Globe program and the closing of the Pittsburgh office by demonstrating that these decisions were inadvisable. In doing so, Koval is essentially challenging the busi-

ness judgment of Dow Jones with respect to these decisions. When an employer offers a business decision as the justification for an adverse employment action, the reasonableness of that decision may be considered to determine whether the decision actually motivated the employment action. *See Wexler*, 317 F.3d at 576–77. An asserted justification based on a business decision may be deemed pretextual if the decision "was so ridden with error that defendant could not honestly have relied upon it." *In re Lewis*, 845 F.2d 624, 633 (6th Cir.1988) (citation and quotation omitted). In this case, defendants do not offer the decisions in question as justifications for discharging Koval. Rather, they cite Koval's reaction to these decisions as substantiation for their asserted justification. Even if Dow Jones's decisions regarding the Toronto Globe program and the Pittsburgh office were offered as justifications for discharging Koval, Koval presents no evidence that such decisions were so unreasonable or erroneous that they could not serve as justification for an employment decision.

was performing proficiently in the desired areas and that ulterior motives must have animated the decision to discharge him.

Koval's performance evaluations from 1995 and 1996 are indeed favorable.[11] His 1995 evaluation relates that Koval "continue[s] to develop a strong team approach." And his 1996 evaluation applauds Koval's "team approach to customer satisfaction." Moreover, both evaluations note that Koval met expectations for working with others. Certainly, these evaluations suggest that Koval improved his attitude and leadership style during 1995 and 1996.

Yet, the matters cited by defendants as supporting the discharge justification occurred after these positive evaluations. For instance, the Katz Business School program for which Koval admits being criticized was implemented in 1997. The Pittsburgh office was eliminated in 1998, to which Koval does not deny objecting. And the replacement of Koval's Toronto distribution network occurred in 1998, to which Koval also does not deny objecting. It was reasonable for Dow Jones to deduce, on account of these specific events and in light of previous criticisms of Koval's leadership, that Koval was again exhibiting negative and territorial leadership traits. As such, Dow Jones possessed an honestly held belief in the justification for discharging Koval from employment, and there is no evidence that this belief did not motivate its decision to discharge Koval.

With respect to whether the asserted justification was sufficient to motivate the decision to discharge Koval. Koval provides no evidence that employees of Dow Jones with a similar track record did not suffer the same fate as Koval.[12]

Koval does not present evidence warranting a finding that the justification presented by defendants for discharging him in 1999—that Koval exhibited a territorial leadership style—has no basis in fact, did not actually motivate the decision to discharge him, or was insufficient to justify the decision. Consequently, Koval fails to produce evidence that the discharge justification offered by defendants is pretextual.

### B. Wrongful Discharge in Violation of Public Policy

Though at-will employees may generally be terminated without cause, Ohio courts recognize that an at-will employee has a cause of action for damages when an employer discharges her for a reason that contravenes public policy. *Collins v. Rizkana*, 73 Ohio St.3d 65, 652 N.E.2d 653, 656 (1995). To present a wrongful dis-

11. These evaluations were written by Howard–Glaspie, who was the RCE supervising Koval at the time.

12. Koval does assert that the Katz Business School program was initially approved by Dow Jones management and, hence, that his administration of the program could not have motivated the decision not to retain him. Koval misconstrues defendants' argument. Defendants claim that Koval's attitude in relation to the Katz program and his response to criticisms of it, not the actual performance of the program, support their justification for discharging him. Even if Koval was discharged on account of the performance of the Katz program, Koval cites no authority in support of the proposition that an employer cannot discharge an employee for the performance of a program that it initially approves. The fact that management initially approves a program does not preclude an employer from evaluating the employee in charge of administering the program on the basis of how the program performs over time. Dow Jones was entitled to hold Koval responsible for the performance of the Katz program regardless of the fact that certain managers at one time approved of it. Moreover, Koval's testimony that he feared his job was not secure on account of perceptions regarding his administration of the Katz program supports the conclusion that his performance could indeed be grounds for his dismissal.

charge claim, the plaintiff must demonstrate: (1) the existence of a clear public policy manifest in a state or federal constitution, statute, administrative regulation, or in the common law; (2) that dismissing employees in circumstances akin to those surrounding plaintiff's discharge would jeopardize the public policy; (3) that plaintiff's dismissal was motivated by conduct related to the public policy; and (4) that the discharge was not supported by an overriding legitimate business justification. *Id.* at 657–58.

The district court found that Koval could not demonstrate the last three elements of a wrongful discharge claim and therefore awarded defendants summary judgment on this claim. Koval asserts that the district court improperly granted summary judgment for defendants on this claim for the same reasons it improperly granted summary judgment for defendants on his discrimination claims. Considering that the district court properly granted defendants summary judgment on Koval's discrimination claims, Koval fails to articulate a ground on which to reverse the district court's grant of summary judgment to defendants on his wrongful discharge claim.

## C. Promissory Estoppel

Under Ohio law, an at-will employee can seek, under a theory of promissory estoppel, to prevent her employer from terminating her employment. *See Mers v. Dispatch Printing Co.,* 19 Ohio St.3d 100, 483 N.E.2d 150, 154–55 (1985). An at-will employee can also obtain damages from an employer under a promissory estoppel theory. *See Patrick v. Painesville Commercial Props., Inc.,* 123 Ohio App.3d 575, 704 N.E.2d 1249, 1256–57 (1997). To present a promissory estoppel claim, a plaintiff must show that the employer has made "a promise clear and unambiguous in its terms to the employee," that he relied on that promise, that the reliance was reasonable and foreseeable, and that he suffered injury on account of the reliance. *See Nealon v. Cleveland,* 140 Ohio App.3d 101, 746 N.E.2d 694, 699 (2000). In adopting the report and recommendation of the magistrate, the district court found that Koval failed to provide evidence that Dow Jones made a clear and unambiguous promise to Koval that he was entitled to continued employment at the company. Koval asserts that the district court erred in this determination.

The Supreme Court of Ohio has explicitly stated that "[a] promise of future benefits or opportunities *without a specific promise of continued employment* does not support a promissory estoppel exception to the employment-at-will doctrine." *Wing v. Anchor Media, Ltd. of Texas,* 59 Ohio St.3d 108, 570 N.E.2d 1095, 1096 (1991) (emphasis added). Koval concedes that he was an at-will employee of Dow Jones. Nonetheless, Koval contends that representations made to him by other Dow Jones employees, comments contained in his performance evaluations, and policies included in Dow Jones's employment handbook combined to constitute a promise to him that he was entitled to continued employment. None of the representations, comments, or polices cited by Koval contain any *specific,* clear, unambiguous promise to Koval of continued employment at Dow Jones. Koval therefore fails to provide evidence in support of an essential element of his promissory estoppel claim.

## III.

For the foregoing reasons, we affirm the judgment of the district court.